**UNITED STATES of America, Plaintiff–Appellant,**

v.

**Raymond M. FREITAS; Walter Freitas; Jonny McClellan, Defendants–Appellees.**

**No. 87–1297.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 14, 1988.

Decided Sept. 13, 1988.

Joseph P. Russoniello and Sanford Svetcov, San Francisco, Cal., for plaintiff-appellant.

Penelope M. Cooper, Cristina C. Arguedas, and Ted W. Cassman, Berkeley, Cal., and Richard B. Mazer, San Francisco, Cal., for defendants-appellees.

Before CHOY, FARRIS and WIGGINS, Circuit Judges.

FARRIS, Circuit Judge:

This is the government's second appeal from a pretrial suppression order entered by the United States District Court for the Northern District of California.[1] On the first appeal, we affirmed the district court's holding that a search warrant violated Fed.R.Crim.P. 41 and the fourth amendment to the U.S. Constitution, *United States v. Freitas*, 800 F.2d 1451, 1455–56 (9th Cir.1986), but reversed the court's ruling that the conduct of the government agents who relied on the defective warrant did not satisfy the "good faith" exception to the exclusionary rule. Because the district court had not found, but merely had assumed, certain facts crucial to the "good faith" inquiry of *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), we remanded for findings on four specific issues: (1) whether the agents had heard of similar surreptitious entry warrants issued elsewhere; (2) whether the agents had consulted with the U.S. Attorney; (3) whether the agents discussed the surreptitious entry with the magistrate; and (4) whether similar warrants had issued in other districts. *Freitas 1*, 800 F.2d at 1457.

The district court, after an evidentiary hearing, made the following factual determinations on remand: (1) The agents were not aware of similar warrants issued in other districts; (2) Similar warrants had not issued in other districts; (3) The agents advised the magistrate of the special nature of the surreptitious entry warrant; and (4) The agents sought the advice of an Assistant U.S. Attorney, who approved the warrant application. The court then ruled that because, in its view, "the flaw on the face of the warrant in this case was so basic that no reasonably well-trained law enforcement officer could have acted in objectively reasonable reliance on the warrant," its findings that the warrant was

---

1. The first suppression order is published as *United States v. Freitas*, 610 F.Supp. 1560, 1563–64 (N.D.Cal.1985). The second suppression order, entered on remand from this court, is not published.

approved by a federal prosecutor and was authorized by the magistrate were not sufficient to establish objectively reasonable reliance within the meaning of *Leon*. As a result, the court ordered that the fruits of the surreptitious search be suppressed.

 Our jurisdiction over this second appeal rests on 18 U.S.C. § 3731. In accordance with our decision in *Freitas 1*, we focus here on the findings made and the conclusions reached by the district court on remand. All purely factual findings are reviewed under the clearly erroneous standard. *United States v. McConney*, 728 F.2d 1195, 1200 n. 5 (9th Cir.) (en banc), *cert. denied*, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). The conclusion that the agents' reliance on the warrant was not objectively reasonable is a mixed question of fact and law that we review *de novo*. *United States v. Dozier*, 826 F.2d 866, 872 (9th Cir.1987); *Freitas 1*, 800 F.2d at 1454. The district court's ruling on the question of whether the Rule 41 violation required suppression of the fruits of the search, which we reach because of our conclusion on the *Leon* issue, is also reviewed *de novo*.

## I. FACTUAL BACKGROUND

A comprehensive factual account of the events leading up to the entry and execution of the surreptitious entry warrant is provided in the district court's first suppression order and our opinion in *Freitas 1*. *See* 800 F.2d at 1452–53; 610 F.Supp. at 1563–64. For the purposes of our more limited inquiry, a concise summation of the relevant facts will suffice.

Raymond Freitas first came under suspicion in the summer of 1984 for the operation of a metamphetamine laboratory at his cabin in Clearlake, California. After receiving approximately five tips from an anonymous informant, many of which were corroborated, DEA agents began surveillance on the Clearlake residence. When suspicious activity was sighted on December 9, 1984, the agents applied for and were issued search warrants for two residences and six storage lockers in the San Francisco Bay Area.

On December 13, one day after the first warrants were issued and three days before they were due to expire, DEA agent Laura Hayes requested a new warrant to enter the Clearlake residence surreptitiously. As issued, this warrant authorized DEA agents to enter the cabin late at night to determine the existence of seizable physical property and to "determine the status of the suspected clandestine metamphetamine laboratory." The magistrate used a conventional warrant form but crossed out the language requiring that property subject to seizure be described and that copies of the warrant and an inventory of the property taken be left at the residence. This omission of any provision in the warrant for notifying Freitas of the search of his residence formed the basis for our holding that Fed.R.Crim.P. 41(b) & (d) were violated. *Freitas 1*, 800 F.2d at 1455–56. It also was the primary factor underlying our fourth amendment holding. *Id.* at 1456. The agents executed this warrant at 11:00 p.m. on December 13.

On December 17, the government applied for an extension of the original eight warrants until December 26. As support for this application, the agents submitted a supplemental affidavit from Agent Wood describing the equipment observed during the December 13 entry. The extension was granted. On December 20, agents arrested defendants and seized the metamphetamine laboratory, together with a large quantity of chemicals, at the Clearlake residence. Defendants moved to have this evidence suppressed.

## II. THE LEON ISSUE

Our discussion of the "good faith" exception to the warrant requirement in *Freitas 1* bears recalling:

> *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), lists four circumstances in which an agent could not claim that his reliance on a warrant was objectively reasonable. The two relevant circumstances here are, first, if the affidavit upon which the warrant was issued was " 'so lacking in indicia of probable cause as to render official

belief in its existence entirely unreasonable,' " *id.* at 923, 104 S.Ct. at 3422 (quoting *Brown v. Illinois,* 422 U.S. 590, 611, 95 S.Ct. 2254, 2265, 45 L.Ed.2d 416 (1975) (Powell, J., concurring in part)), and second, if the warrant either "fail[ed] to particularize the place to be searched or the things to be seized," *id.* at 923, 104 S.Ct. at 3422. Neither of those circumstances is present in this case. The warrant described the place to be searched (Freitas' Clearlake residence) and the items to be observed (evidence of a drug laboratory), and the affidavit upon which the request for the warrant was based referred to that of the previous day (Dec. 12).

In the companion case to *Leon, Massachusetts v. Sheppard,* 468 U.S. 981, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984), the Court described the type of behavior that would render an agent's reliance on an invalid warrant objectively reasonable. The detective in *Sheppard* showed his affidavit to the district attorney, and the district attorney approved it; the detective then gave the approved affidavit to a judge, who found that probable cause existed; the detective asked the judge to change the warrant form because the agent had not been able to find a copy of the correct form for the particular search requested, and the judge made some changes. *Id.* at 985–86, 104 S.Ct. at 3427. In fact, the Court went on to explain that, if "[a]n error of constitutional dimensions may have been committed with respect to the issuance of the warrant," the fault was the judge's and did not affect the determination of the *officer's* objective reasonableness. *Id.* at 990, 104 S.Ct. at 3429. Although the district court in this case assumed that the agents had heard of similar surreptitious entry warrants issued elsewhere, that the agents had asked the advice of an Assistant U.S. Attorney, and that the agents discussed the surreptitious entry with the magistrate, it concluded that the agents' reliance on the warrant was objectively unreasonable. In light of *Sheppard,* this conclusion is incorrect.

800 F.2d at 1457 (emphasis in original). We instructed the district court to "make explicit findings" with respect to the four crucial facts on which it had made assumptions, and to withdraw its suppression order if its findings were consistent with its earlier assumptions. *Id.* "Should the district court find one or more of these assumptions not supported by the facts," we instructed it to apply "the good faith exception ... to the facts as they are found to be." *Id.*

As described above, the court's findings on remand with respect to two of the four issues were inconsistent with the assumptions described in our opinion. The government maintains that, despite the fact that we remanded for factual findings on these issues, we should now review the district court's determinations *de novo.* According to the government, the court's conclusions that the agents had no knowledge of similar warrants and that no similar warrants had in fact issued in other districts are legal conclusions, not factual findings. We are unpersuaded by the government's argument. Our instructions in *Freitas 1* explicitly stated that the similarity of other warrants and the agents' knowledge about other covert warrants were *factual* inquiries. The government may not agree with the findings that were made on these issues, but in order to overturn them it must show that the findings were clearly erroneous. It has not done so.

Having reviewed the testimony of the agents at the remand hearing, we are not definitely and firmly convinced that the court erred in its findings that the covert warrants issued in earlier cases were not similar to the warrant in this case, and that the agents who prepared the warrant in this case were not aware of similar warrants issued in other cases. *See United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948); *Sutton v. Atlantic Richfield Co.,* 646 F.2d 407, 412 (9th Cir.1981). The primary basis for these findings—that the covert warrants used in a 1983 Oakland search of a storage locker differed in several important respects from the warrant at

issue here—was supported by the record. None of the six Oakland warrants affirmatively deleted Rule 41(d)'s notice provisions and two of them affirmatively required that a copy of the warrant be left at the premises. By contrast, Agent Hayes, who prepared the covert warrant in the instant case, struck out the notice language on the warrant form with a typewriter.

In addition, whereas the Oakland warrants authorized surreptitious searches of storage lockers, the agents in this case surreptitiously entered a private residence. Although the government may correctly assert that the fourth amendment applies to storage facilities as well as to private residences, its contention that the agents' awareness that a covert warrant had been used to enter a public storage locker may be automatically transferred to a private residential situation is disingenuous and counterintuitive. It requires no legal degree or up-to-date awareness of Supreme Court and Ninth Circuit law to know that there is a difference between entering a home and entering a storage locker. Common sense and a rudimentary familiarity with our national history and consciousness tell us that no privacy interest strikes closer to the heart of the fourth amendment than protection from physical entry of the home. It is for this reason that the Supreme Court has called "the physical entry of the home ... the chief evil against which the wording of the Fourth Amendment is directed." *United States v. United States District Court,* 407 U.S. 297, 313, 92 S.Ct. 2125, 2134, 32 L.Ed.2d 752 (1972); *see also Payton v. New York,* 445 U.S. 573, 590, 100 S.Ct. 1371, 1382, 63 L.Ed.2d 639 (1980). For as we stated in *Freitas 1,* "The mere thought of strangers walking through and visually examining the center of our privacy interest, our home, arouses our passion for freedom as nothing else." 800 F.2d at 1456.

Because the Oakland warrants were materially different from the covert warrant issued here, the court did not commit clear error in ruling that the agents involved in preparing the Clearlake warrant were not aware of "similar" warrants in prior cases. Moreover, the testimony adduced on re-

mand demonstrated that the agents who had personal knowledge of the Oakland case did not participate in preparing the Clearlake warrant, nor did they convey their knowledge of the facts surrounding the Oakland searches to Agent Hayes. Agent Hayes testified that Agent Largent, who had never seen the 1983 warrants but had been involved in the Oakland investigation and had drafted the affidavits supporting the warrants in that case, told her only that "he had used [a covert warrant] in a prior lab case that he had worked on." She also testified that "[a]nother DEA agent told me that he knew that the FBI used them; he had never used one personally." As the district court recognized, the problem with these statements is that they give no indication that the person who prepared the warrant had any information about the facts surrounding the prior surreptitious entry. Agent Hayes testified that she did not recall ever hearing about a covert entry warrant that completely dispensed with notice and that she never looked at any applications for covert warrants. And Agent Wood, from whom Agent Hayes received her instructions to prepare the covert warrant, testified that he had never actually seen any of the Oakland affidavits or warrants, but had been told about them by Agents Largent and Segal. This undisputed testimony buttresses our conclusion that the district court did not commit clear error in ruling that the agents involved in preparing the covert warrant in this case did not know of similar warrants issued in other cases. Even if the Oakland warrants were similar to the Clearlake warrant—which in any event we have held they are not—there was sufficient evidence to support the finding that the agents who prepared the covert warrant in this case lacked personal knowledge of the prior investigation.

Because the district court's findings on the similarity and knowledge issues were not clearly erroneous, the court properly inquired into whether the facts as found satisfy the good faith exception. In arriving at the legal conclusion that the agents did not act with objective reasonableness, the court weighed the two factual

findings that militated in favor of good faith against the findings that suggested that the officers did not act reasonably in relying on the illegal warrant. This balancing raises a mixed question of fact and law which we review *de novo. Dozier,* 826 F.2d at 872.

Our independent review of the factual record convinces us that there was sufficient basis, though barely so, for the agents to act reasonably in reliance on the warrant. The evidence is undisputed that after discussing the possibility of using a covert warrant with Agents Largent and Hayes, Agent Wood contacted Assistant United States Attorney Eric Swenson and described the circumstances in Clearlake in detail. Agent Largent also spoke with Swenson. Swenson replied that he wanted to do some research before responding, and Agent Wood then instructed Agent Hayes to prepare the warrant with Swenson. Hayes did just that. Swenson helped Hayes in the drafting of the entire document and supplied her with the paragraph that describes the need for covert entry. Even more importantly, Swenson instructed Hayes to type in the language purporting to excuse notice and to cross out the provision for leaving a copy of the warrant at the searched premises.

Agent Hayes testified further, and the district court found, that she took the completed warrant to Magistrate Brazil and advised him "about the agents' desire to conduct a surreptitious search of the Clearlake residence and pointed out the changes she had made on the face of the warrant form." Magistrate Brazil read the entire warrant and supporting affidavit in Hayes' presence and then told her that although he had never authorized a warrant like this before, he knew he had the authority to do it. The magistrate inserted a December 15 deadline for serving the warrant and then approved it.

These two undisputed facts—the approval by an Assistant U.S. Attorney of the illegal warrant provisions and the ratification of the warrant by a neutral magistrate—bring this case within the holding of *Massachusetts v. Sheppard.* In that case,

the police detective prepared an affidavit which was reviewed and approved by the District Attorney. He presented that affidavit to a judge. After the judge told the detective that he would authorize the warrant, the detective "produced the warrant form and informed the judge that it might need to be changed. He was told by the judge that the necessary changes would be made. He then observed the judge make some changes...." 468 U.S. at 989, 104 S.Ct. at 3428. In concluding that the police "took every step that could reasonably be expected of them," *id.,* the Court reasoned:

> An error of constitutional dimensions may have been committed with respect to the issuance of the warrant, but it was the judge, not the police officers, who made the critical mistake. "[T]he exclusionary rule was adopted to deter unlawful searches by police, not to punish the errors of magistrates and judges." *Illinois v. Gates,* 462 U.S. 213, 263, 103 S.Ct. 2317, 2345, 76 L.Ed.2d 527 (1983) (WHITE, J., concurring in judgment).

*Id.* at 990, 104 S.Ct. at 3428.

Like the police detective in *Sheppard,* the agents involved in the instant case consulted and secured the approval of a government attorney. They then fully informed the magistrate of the contents of the warrant, including the controversial deletion of the notice provisions, and obtained his approval as well. These acts were sufficient to establish objectively reasonable behavior under *Sheppard.*

Despite the factual similarities between his case and *Sheppard,* Freitas argues that *Sheppard* is distinguishable because it was the judge who modified the face of the warrant in that case, whereas in this case the agents themselves doctored the document. The language in *Sheppard* to which Freitas points in support of this distinction, however, is addressed to a different situation. The warrant in *Sheppard* was defective because it did not particularly describe the items to be seized. *See id.* at 987, 104 S.Ct. at 3427. The footnote on which Freitas relies is addressed to the case in which an officer "executes a warrant without knowing beforehand what

items are to be seized...." *Id.* at 989 & n. 6, 104 S.Ct. at 3428 & n. 6. In response to that scenario, the Court stated: "Whether an officer who is less familiar with the warrant application or who has unalleviated concerns about the proper scope of the search would be justified in failing to notice a defect like the one in the warrant in this case is an issue we need not decide." *Id.* at 989 n. 6, 104 S.Ct. at 3428 n. 6.

In direct contrast to the situation addressed in footnote six of *Sheppard,* the agents in this case not only noticed the potential defect in the warrant, they brought it to the attention of an Assistant U.S. Attorney and the magistrate, who both approved it. Sheppard teaches that the agents were not required to disbelieve these experts. *See id.* at 989–90, 104 S.Ct. at 3428. Thus, even if the agents' conduct in this case was not, as in *Sheppard,* "largely error-free," *id.* at 990, 104 S.Ct. at 3428, it was objectively reasonable. And while the advice of Attorney Swenson and Magistrate Brazil was faulty, it is the conduct of the agents—not their legal advisors—on which we must focus. We hold, therefore, that the court erred in ruling that the agents' conduct did not satisfy the requirements of the "good faith" exception to the exclusionary rule.

## III. RULE 41

Because we hold that the constitutional defect in the warrant does not necessitate suppression of the fruits of the surreptitious search, we must also reach the question of whether the statutory violation found in *Freitas 1* warrants suppression. The district court was of the opinion that suppression is required. We address this question *de novo.*

█ The district court based its ruling on two alternative grounds: (1) The Rule 41 violation was "fundamental" and therefore required automatic suppression; and (2) Even if the violation was "technical" rather than "fundamental," suppression was required because the agents "intentionally and deliberately disregarded the explicit notice provisions of Rule 41(d)." The government does not respond to the first holding, but maintains that the second holding misrepresented the factual record and misconstrued the law.

We agree with the government's argument on the "deliberate disregard" prong. Unlike the objective reasonableness test of *Leon* and *Sheppard,* Rule 41's rule of intentional and deliberate misconduct requires subjective bad faith on the part of the government agents. In reaching the conclusion that the government agents in this case acted in bad faith, the district court disregarded the testimony that the agents still would have conducted the search if a provision for notifying Freitas within seven days had been inserted into the warrant. The court also overlooked the fact that the agents consulted with Attorney Swenson and Magistrate Brazil. And the testimony upon which the court relied (to the effect that the search would not have been carried out had the agents been required to leave notice at the premises) establishes only that the agents wanted to effect a covert search. The overwhelming evidence in this case is that the agents acted in subjective good faith in preparing and executing the warrant. This ruling, therefore, cannot stand.

█ As the court realized and the government apparently overlooks, however, the test for subjective bad faith only becomes relevant when a Rule 41 violation is merely "technical," rather than "fundamental." *See Freitas 1,* 800 F.2d at 1456. Were the violation in this case "fundamental," automatic suppression of the evidence would be required. *United States v. Ritter,* 752 F.2d 435, 441 (9th Cir.1985). "[A] violation is 'fundamental' only where it, in effect, renders the search unconstitutional under traditional fourth amendment standards." *United States v. Johnson,* 660 F.2d 749, 753 (9th Cir.1981), *cert. denied,* 455 U.S. 912, 102 S.Ct. 1263, 71 L.Ed.2d 452 (1982), *quoted in Ritter,* 752 F.2d at 441.

█ The fact that the constitutional defect in the warrant is excused because the officers relied reasonably on the advice of their attorney does not mean, of course, that the search necessarily satisfied "tradi-

tional fourth amendment standards." But by the same token, the fact that we found a fourth amendment violation in *Freitas 1* does not mean that the Rule 41 violation was "fundamental." For the violation to be "fundamental," there must have been "a *clear* constitutional violation." *United States v. Stefanson*, 648 F.2d 1231, 1235 (9th Cir.1981) (emphasis added); *see also Navarro v. United States*, 400 F.2d 315, 318–20 (5th Cir.1968), *discussed in United States v. Radlick*, 581 F.2d 225, 228 (9th Cir.1978). This was not such a clear case, as our reasoning in *Freitas 1* demonstrates. Although we ultimately concluded that the warrant was constitutionally defective, we noted that if it had provided for post-search notice within seven days, it would not have crossed over the constitutional line. *See* 800 F.2d at 1456. The constitutional infirmity did not emanate from the surreptitious nature of the entry, *see id.* (citing *Dalia v. United States*, 441 U.S. 238, 247, 99 S.Ct. 1682, 1688, 60 L.Ed. 2d 177 (1979)), or even from the fact that the warrant failed to provide for contemporaneous notice, 800 F.2d at 1456. Rather, it was based on a distinction between post-search notice and no notice. This distinction is too tenuous a hook upon which to hang a finding of fundamentality, especially considering the agents' testimony that they would have gone ahead with the search had they been told that post-search notice was required. *See Radlick*, 581 F.2d at 228 (quoting *United States v. Burke*, 517 F.2d 377, 386–87 (2d Cir.1975) (stating that suppression is appropriate under Rule 41 when there is " 'prejudice' in the sense that the search might not have occurred or would not have been so abrasive if the Rule had been followed")); *accord Ritter*, 752 F.2d at 441; *cf.* Fed.R. Crim.P. 52(a); *United States v. Studley*, 783 F.2d 934, 941 (9th Cir.1986) (admission of illegally obtained evidence subject to harmless error doctrine).

Further, the failure to notify Freitas of the surreptitious search did not affect his completion of the crime. His criminal conduct was substantially completed by the time of that search. Had the preparation of the metamphetamine laboratory been in its early stages and Freitas continued to purchase chemicals or otherwise compound the illegality of his operation after the covert search, this would be a different case. But as the district court noted in its order, when the agents entered the Clearlake residence on December 13 they "observed extensive laboratory equipment and chemicals used in the manufacture of metamphetamine." The operation was so advanced that the supplemental affidavit written by Agent Wood after the search was sufficient to support warrants for the arrest of Freitas and his codefendants, and for the seizure of evidence at the Clearlake residence. There is no evidence that Freitas took action after December 13 which materially altered the evidence.

REVERSED.