UNITED STATES of America,
Plaintiff–Appellant,

v.

Nancy BROWN and Michael Kaliterna,
Defendants–Appellees.

No. 90–50487.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 7, 1991.

Decided Dec. 6, 1991.

As Amended on Denial of Rehearing and Rehearing En Banc Feb. 20, 1992.

Jeffrey C. Eglash, Asst. U.S. Atty., Los Angeles, Cal., for plaintiff-appellant.

Roger S. Hanson, Santa Ana, Cal., for defendant-appellee Brown. Leonard Levine, Los Angeles, Cal., for defendant-appellee Kaliterna.

Before BROWNING, ALARCON and T.G. NELSON, Circuit Judges.

ALARCON, Circuit Judge:

The United States Government appeals from the order granting motions filed by Nancy Brown and Michael Kaliterna to suppress evidence seized from their residences. The district court ruled (1) the warrants authorizing the searches were not supported by probable cause, and (2) the officers who obtained the warrants did not act in good faith.

The Government seeks reversal on the following grounds: (1) the magistrate had substantial basis to conclude that probable cause existed for the search of appellees' residences based on the affidavits offered in support of the search warrants, and (2) the officers who conducted the searches had a reasonable, good-faith belief in the validity of the warrants. We reverse because we conclude that the officers had a reasonable, good-faith belief in the validity of the search warrants.

I.

FACTS

Defendants Brown and Kaliterna were law enforcement officers assigned to a narcotics and money laundering detection unit of the Los Angeles County Sheriff's Department (LACSD) known as Major Violators Crew 2 (Majors 2). The Majors 2 team was one of four units responsible for the investigation of major narcotics dealers and money launderers. Majors 2 consisted of nine officers.

On June 13, 1989, Special Agent Robert Hightower of the Federal Bureau of Investigation (FBI) received a report from Lieutenant Kenneth Chausee of the LACSD that members of the Majors teams were engaging in criminal activity. Lt. Chausee informed Agent Hightower that he had received an anonymous letter from a person who claimed to be the wife of a Majors team member in which the informant asserted that her husband, his teammates, and other Majors personnel were stealing money and other items seized from suspects. The informant also reported that Majors team members were living well beyond the means to which they were limited by their government salaries.

On the basis of this letter, the FBI, LACSD and the Internal Revenue Service (IRS) began an investigation of the activities of Majors team members. As a part of this investigation, Agent Hightower and

other officers secretly examined the financial records of all the members of the Majors teams and collected information from various sources regarding thefts and acts of corruption committed by Majors members. The investigation also included an undercover sting operation, designed to catch Majors team members in the act of stealing from law enforcement officers impersonating drug traffickers and money launderers.

In preparation for the sting operation, two officers posing as money launderers, rented a penthouse room in the Valley Hilton Hotel in Sherman Oaks, California, on August 29, 1989. Information concerning the purported money launderers was transmitted to the Majors 2 team through official channels.

On the afternoon of August 30, 1989, the entire Majors 2 team conducted a surveillance of the activities of the guests in the Hilton penthouse. At approximately 2:00 p.m., one of the undercover officers, who was posing as a money launderer, left the penthouse room. Officers James Bauder and Daniel Garner, two of the members of Majors 2, entered the room without a search warrant. The officers found an athletic bag planted by the undercover officers that contained $30,000. Bauder and Garner removed the $30,000 from the bag and left the room.

Later that evening, at approximately 9:00 p.m., Majors 2 team members Robert Sobel, Bauder, Brown, Garner and Kaliterna detained one of the undercover officers outside the penthouse room. The Majors 2 team "returned" with the undercover officer to the penthouse room. Once inside the penthouse room, Sobel, Bauder, Brown and Garner gathered around a table. Kaliterna was a slight distance away from the table. On the table was the athletic bag, a sack containing $18,000 and a garment bag containing $450,000. Bauder seized the sack, displayed its contents to Sobel, Brown and Garner, and left the room.

Only $450,000 of the $498,000 that the undercover agents originally brought into the penthouse room was booked into the LACSD as evidence. The $30,000 seized by Bauder during his first entry into the penthouse room and the $18,000 subsequently removed by him were not booked into the LACSD as evidence.

Based on the evidence that $48,000 was retained by members of the Majors 2 team from the total amount seized from the undercover officers, which confirmed the various tips that the unit was corrupt and engaged in thievery, federal agents sought warrants to search the residences of each of the Majors 2 members who entered the penthouse room, including those of Brown and Kaliterna. The affidavits of Agent Hightower and Special Agent Dwayne Davidson of the IRS were presented in support of the request for warrants. Their affidavits contain three categories of facts and circumstances, (1) information that suggested wrongdoing by the Majors teams as a whole, but that did not name specific teams or current members of those teams, (2) information directly implicating certain members of Majors 2, but not Brown and Kaliterna, and (3) information derived from the retention of some of the money seized from the penthouse room by a member of the Majors 2 team, while Brown and Kaliterna were present.

### A. *Information on Majors Teams Generally*

The affidavits contain reports from four informants who described illegal activities on the part of Majors units but did not implicate any officer who was a current member of the Narcotics Bureau. The first report described in the affidavits is contained in an anonymous letter from a person who identified herself as the wife of a Majors team member. The affidavits allege that she reported that her husband and his teammates stole money and other items during narcotics raids. The second report in the affidavits is from an unidentified LACSD officer who said that it is "standard operating procedure" for Majors team members to keep a portion of the monies seized during their investigations. The third report is from retired LACSD officer J.T. Jones. Mr. Jones told the investigators that unidentified Majors team members were investing large amounts of money in a Sizzler restaurant. The affida-

vits also contain information received from Sal Munoz, an LACSD officer. Officer Munoz reported that Majors personnel had been stealing raid money since 1985. Although Munoz named several specific officers, none of them were still working in the Narcotics Bureau at the time of the investigation.

### B. Information on Deputies Amers, Cortez and Daub

The affidavits contain investigative reports regarding Majors 2 team members Terrell Amers, Eufrasio Cortez and Ronald Daub. Daub and Cortez had purchased expensive cars, boats, and real estate. These expenditures occurred shortly after a large amount of currency was seized by members of Majors 2. The affidavits also allege that Assistant United States Attorney Steven Madison was told by a defendant in another case that Amers and Cortez had reported only $135,000, instead of the $200,000 that was in the defendant's possession at the time of his arrest.

### C. Information From the Sting Operation

The affidavits allege that Brown and Kaliterna were present in the penthouse room when Bauder displayed the contents of the sack containing $18,000. The affidavits also state that Kaliterna was standing slightly away from the table where the sack was located.

A magistrate issued warrants for the search of the residences of Brown, Kaliterna and the rest of the Majors 2 team members who were in the penthouse room. These searches resulted in the recovery of a large amount of cash. Part of the sting money used in the undercover operation at the Valley Hilton was found during the search of Brown's and Kaliterna's residences. Subsequently, Brown and Kaliterna were indicted on several charges of theft and conspiracy to commit theft. Kaliterna was also charged with filing a false tax return.

## II.

## DISCUSSION

### A. Existence of Probable Cause to Search the Residences of Brown and Kaliterna

■ The Government contends that the district court erred in determining that the magistrate did not have a substantial basis for finding probable cause to search the residences of Brown and Kaliterna. Instead, the Government argues that evidence that members of Majors 2 were stealing money from arrestees, and the presence of Brown and Kaliterna at the penthouse room when $18,000 was displayed by Bauder, demonstrates that probable cause existed for the issuance of the search warrants. In assessing the validity of a search warrant, this court must determine whether the magistrate had a "substantial basis" to conclude that probable cause existed to issue the warrant. *Illinois v. Gates*, 462 U.S. 213, 236, 103 S.Ct. 2317, 2331, 76 L.Ed.2d 527 (1983); *United States v. Castillo*, 866 F.2d 1071, 1076 (9th Cir.1988).

### 1. Probable Cause Based on Membership in Majors 2

■ The Government argues that the affidavits contained sufficient facts to provide probable cause for the belief that each of the Majors 2 team members who entered the penthouse was engaged in corrupt conduct. Because of the pervasiveness of this illegal conduct, the Government argues that the officers in the Majors 2 unit could not have continued their thievery without fear of discovery, unless each member of the unit participated. Accordingly, the Government asserts that Brown's and Kaliterna's membership in Majors 2 was sufficient to establish probable cause to search their residences.

In support of this contention the Government relies on *United States v. Rubio*, 727 F.2d 786 (9th Cir.1983). In *Rubio*, a federal magistrate issued a warrant authorizing searches in various residences for indicia of membership in the Hell's Angels motorcycle club. *Id.* at 790. We held that proof of mere membership in the Hell's Angels, without a link to actual criminal activity, was insufficient to support a finding of probable cause. *Id.* at 793. We noted,

however, in *dictum* that "[i]f such a large portion of the subject organization's activities are illegitimate so that the enterprise could be considered, in effect, wholly illegitimate, then there would certainly be cause to believe that evidence of a suspect's association with that enterprise would aid in a ... conviction." *Id.*

The Government argues that the extent of corruption present in the Majors 2 team, as shown by the affidavits, rendered it the type of "wholly illegitimate" organization contemplated by the court's *dictum* in *Rubio*. We reject this argument for two reasons.

First, the Government incorrectly concludes that Majors 2 was a "wholly illegitimate" organization. The primary responsibility of the Majors 2 unit was to investigate major narcotics dealers and money launderers. The fact that the Government had information that this legitimate responsibility was accompanied by thefts on the part of some of the team members did not transform this law enforcement unit into a "wholly illegitimate" enterprise.

Second, even if there was a widespread "conspiracy of corruption" in Majors 2, as the Government alleges, the information contained in the affidavits fails to establish probable cause to believe that Brown and Kaliterna were part of that conspiracy. The affidavits show only that Brown and Kaliterna belonged to a narcotics unit that was the target of an investigation and sting operation, and that one member of the team took a sack of sting money out of a hotel room when Brown and Kaliterna were present. There is no allegation in the affidavits that Kaliterna saw Bauder display the money and remove it from the penthouse room. We are persuaded that the facts set forth in the affidavits did not provide a substantial basis for the magistrate's probable cause determination.

The Government's reliance on *United States v. Baron*, 860 F.2d 911 (9th Cir. 1988), *cert. denied*, 490 U.S. 1040, 109 S.Ct. 1944, 104 L.Ed.2d 414 (1989), is also misplaced. In *Baron*, we held that federal narcotics agents had probable cause to arrest and search the body of a woman seen in the company of two drug dealers when the dealers received a package of cocaine

and destroyed a transmitter attached by police to the package. *Id.* at 917. We reasoned that a delivery of cocaine "'could not normally be carried on without the knowledge of all persons present.'" *Id.* (quoting *United States v. Hillison*, 733 F.2d 692, 697 (9th Cir.1984).

The Government contends that Bauder could not have stolen $18,000 of the sting money without the knowledge of Brown and Kaliterna since they were both in the room and Bauder displayed the money before leaving the penthouse room with it. We disagree. Part of Bauder's job as a member of the Majors 2 unit was to seize money in the possession of narcotics traffickers and money launderers. Bauder's actions in the penthouse room during the sting operation were consistent with the ordinary execution of his official duties. Bauder's conduct did not establish probable cause to conclude that Brown and Kaliterna knew of Bauder's intention to steal the $18,000, or that they participated in the theft. We conclude that Bauder's actions in the penthouse room were "insufficient to provide the requisite nexus between the association of the defendants with the enterprise and some form of criminal activity." *Rubio*, 727 F.2d at 794.

### B. *Application of the Good–Faith Exception to the Exclusionary Rule*

█ The Government argues that even if probable cause did not exist to issue the search warrants, the officers who obtained the warrants and conducted the search had an objective, good-faith belief in their validity. The district court rejected this theory, finding that the affidavits were so lacking in probable cause with respect to Brown and Kaliterna that "a reasonable officer could not have relied upon it." The question whether an agent's reliance on a warrant was objectively reasonable is a mixed question of law and fact subject to *de novo* review. *United States v. Freitas*, 856 F.2d 1425, 1428 (9th Cir.1988); *Center Art Galleries—Hawaii, Inc. v. United States*, 875 F.2d 747, 752 (9th Cir.1989).

█ In *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), the Supreme Court created a good-

faith exception to the exclusionary rule. *Id.* at 920–23, 104 S.Ct. at 3419–21. A motion to suppress evidence obtained with an invalid search warrant may be denied if the officers who obtained the evidence had a reasonable belief in its validity. *Id.* at 922, 104 S.Ct. at 3420; *see also Massachusetts v. Sheppard,* 468 U.S. 981, 990, 104 S.Ct. 3424, 3428, 82 L.Ed.2d 737 (1984). "Penalizing the officer for the magistrate's error, rather than his own," the Court reasoned, "cannot logically contribute to the deterrence of Fourth Amendment violations." *Leon,* 468 U.S. at 921, 104 S.Ct. at 3419. The good-faith exception does not apply, however, where the warrant is facially deficient, where the magistrate was misled by an officer's dishonesty or disregard for the truth, or where the magistrate abandons his judicial role. *Id.* at 923, 104 S.Ct. at 3420; *United States v. Michaelian,* 803 F.2d 1042, 1046 (9th Cir.1986); *United States v. Tate,* 795 F.2d 1487, 1490 (9th Cir.1986). Under these conditions, "a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Leon,* 468 U.S. at 922, n. 23, 104 S.Ct. at 3420, n. 23.

Brown and Kaliterna contend that the executing officers did not act in good faith, because a well trained officer should know that mere guilt by association or presence at the scene of a crime is insufficient probable cause to support a search warrant. *See, e.g., Ybarra v. Illinois,* 444 U.S. 85, 91, 100 S.Ct. 338, 342, 62 L.Ed.2d 238 (1979). Defendant Brown also argues that *Leon* is inapplicable to her because Agent Hightower misled the magistrate by failing to inform him that she had been a member of Majors 2 for only three months prior to the sting operation. Brown argues that failure to inform the magistrate that she was not a member of Majors 2 during the time that other members of this unit committed thefts demonstrates a lack of good faith.

■ We are convinced from our independent review of the record that the officers who obtained the warrant and conducted the search had reasonable grounds to believe that the warrant was properly executed. First, the warrant was not facially deficient in that it provided an adequate description of the place to be searched and the items to be seized.[1] *United States v. Stubbs,* 873 F.2d 210, 212 (9th Cir.1989) (facial deficiency of warrant may result from failure to specify which items are authorized to be seized and officers may not rely in good faith on such warrant). Second, there are no facts in the record that would lead the officers to believe that the magistrate was not acting in a neutral and detached fashion, consistent with his judicial role in issuing the warrants. Third, the information contained in the affidavits was obtained through an extensive investigation of the Majors 2 team members lasting approximately three months and involving several different law enforcement agencies. *See Michaelian,* 803 F.2d 1042 at 1047 (noting importance of extensive investigation in establishing good faith).

Although the information obtained in that investigation does not appear to us to support a finding of probable cause, it nevertheless provided the officers with a reasonable basis to suspect that Brown and Kaliterna were involved with a group of rogue officers who were engaged in corrupt activities. From their surveillance of Majors 2, the officers observed that the unit acted as a team with respect to the majority of its functions. In addition, Brown and Kaliterna's participation in the second warrantless entry into the penthouse room suggested that the members of

---

1. The affidavits provided specific addresses and locations at those addresses which were authorized to be searched. In addition, the warrants provided a highly detailed list of the items authorized to be seized, including "large quantities of United States currency; cashier's checks ... indicating a remitter to be an individual other than the individual purchasing the check ...; indicia of occupancy, residency or ownership of the premises ... including utility bills, tele-phone bills ...; airline tickets, travel agency billings ... relating to travel which are the fruits, instrumentalities, and evidence of violations of 18 U.S.C. 1956(a), 1951, 1952, 1343...." *Compare United States v. Crozier,* 777 F.2d 1376, 1381 (9th Cir.1985) (warrant authorizing search for "[m]aterial evidence of violation [of] 21 USC 841, 846" facially deficient, precluding reasonable reliance).

Majors 2 acted as a team in committing unlawful acts.

■ Ordinarily, the arrest of a person outside of a residence or hotel room does not justify a warrantless search of the residence or room itself. *See Chimel v. California*, 395 U.S. 752, 763, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685 (1969) (limiting the scope of a warrantless search incident to an arrest to the area within the arrestee's immediate control); *Vale v. Louisiana*, 399 U.S. 30, 33–34, 90 S.Ct. 1969, 1971–72, 26 L.Ed.2d 409 (1970) (holding that in order for the search of a house to be incident to arrest, the arrest must take place inside the house); *United States v. Whitten*, 706 F.2d 1000, 1016 (9th Cir.1983) (holding that the rule established in *Chimel* does not permit officers to lead arrestees to different locations in order to establish a search incident to the arrest). There are exceptions to this rule when, for example, there are exigent circumstances, or when an officer accompanies an arrestee into a residence or room in order to allow the arrestee to obtain clothing or identification. *See Washington v. Chrisman*, 455 U.S. 1, 7, 102 S.Ct. 812, 817, 70 L.Ed.2d 778 (1982) (entry of police officer into room of arrestee while allowing arrestee to obtain identification was not unreasonable under the Fourth Amendment). The record does not contain any information that demonstrates the existence of exigent circumstances or that entry into the penthouse room was necessary to accommodate the arrestee.

Beyond the actual results of the investigation, we also note two specific aspects of the officers' conduct that demonstrate their good faith in attempting to obtain valid search warrants supported by probable cause. When Agent Hightower first went to the magistrate on September 1, 1989, he did not request warrants for the residences of all nine members of Majors 2. Instead, except for Cortez and Daub, he requested warrants to search only the residences of those officers who were present in the

penthouse room when deputy Bauder displayed the $18,000 that he failed to book as evidence.[2] Search warrants were also requested for Cortez and Daub, although they were not present in the penthouse, based on evidence that, prior to August 20, 1989, they had purchased expensive cars, boats, and real estate after a large amount of currency was seized by Majors 2. In addition, Agent Hightower obtained the advice of an assistant United States Attorney prior to applying for a search warrant from the magistrate.

We have previously held that an officer's consultation with a government attorney is of significant importance to a finding of good faith. *Ortiz v. Van Auken*, 887 F.2d 1366, 1368–70 (9th Cir.1989); *United States v. Luk*, 859 F.2d 667, 677–78 (9th Cir.1988); *Freitas*, 856 F.2d at 1431. In *Freitas* and *Ortiz*, for example, we held that the approval of illegal provisions in a search warrant by an Assistant United States Attorney, combined with the magistrate's ratification, was sufficient to establish good faith. *Freitas*, 856 F.2d at 1431; *Ortiz*, 887 F.2d at 1368–69. In both of these cases we relied on *Massachusetts v. Sheppard*, 468 U.S. 981, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984), the companion case to *Leon*, in which the Court held that after consulting both a government attorney and a neutral detached magistrate, the officers were not "required to disbelieve" these experts. *Id.* 468 U.S. at 989–90, 104 S.Ct. at 3428–29.

We believe that an officer's consultation with a government attorney is of even greater importance where, as here, a point of law relating to the scope of Fourth Amendment search and seizure was not yet settled at the time the warrant issued. In the first half of this opinion, we determined for the first time that the "wholly illegitimate" organization exception suggested in our *Rubio* decision, 727 F.2d at 793–94, does not apply to a law enforcement unit suspected of widespread corruption. Although we have concluded that a law en-

---

**2.** Agent Hightower did not seek search warrants for Amers' residence until large amounts of currency had been discovered during the searches of the other Majors 2 deputies' homes. Officer John Dickenson consented to a search of his residence.

forcement investigation unit is not a "wholly illegitimate" organization, we have also determined from reviewing the totality of the circumstances known to the officers in this case that they reasonably believed that the searches were supported by probable cause because the crimes committed by members of Majors 2 could not have been kept secret without the knowledge and willful participation of each officer on these crimes, or in the obstruction of justice by failing to report them. Our dictum in *Rubio* left unclear what types of organizations we would classify as "wholly illegitimate" so as to permit the search of the residence of a person associated in its activities. We hold, therefore, that Agent Hightower and Agent Davidson acted in good faith.

A similar approach has been adopted by the Supreme Court in cases in which persons seek damages for alleged violations of constitutional rights. *See Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). In order to demonstrate qualified immunity in civil actions, the Court has required that the actions of government officials possess "objective legal reasonableness." *Harlow,* 457 U.S. at 819, 102 S.Ct. at 2738. This reasonableness analysis examines the official's actions in light of legal rules that were "clearly established" at the time the action was taken:

> [T]he judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred. If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to "know" that the law forbade conduct not previously identified as unlawful.

*Id.* at 818, 102 S.Ct. at 2738 (footnote omitted).

Thus, in *Anderson,* the Court held that an FBI agent might possess qualified immunity against suit for the warrantless search of respondent's home conducted while the agent was searching for a fugitive bank robber. 483 U.S. at 646, 107 S.Ct. at 3042. Although the Court acknowledged that the respondent had asserted a clearly established right, namely the right of persons to be free from warrantless searches of their homes, the Court held that it was not established whether the circumstances surrounding the agent's actions constituted exigent circumstances. *Id.* at 641, 107 S.Ct. at 3039. The Court remanded in *Anderson* for a determination whether "in light of the clearly established principles governing warrantless searches, he could, as a matter of law, reasonably have believed the search of the [respondent's] home was lawful." *Id.* (footnote omitted).

■ We believe the test established by the Supreme Court to determine objective good faith in civil rights actions can serve as a guide in determining when an officer has acted in good faith in seeking a search warrant. We hold that, because the law was not clearly established at the time the search warrants were issued, the affiants could have entertained a good faith belief in their validity. In this matter it was not clearly established at the time the warrant was issued that probable cause could not be shown by proof that a person belonged to a corrupt law enforcement unit whose success depended on the silence and cooperation of all its members.

■ Finally, we note that Agent Hightower's failure to inform the magistrate of Brown's starting date of employment does not preclude a finding of good faith in this case. Although Brown correctly points out that *Leon* does not apply where the officer deliberately misled the magistrate, 468 U.S. at 923, 104 S.Ct. at 3420, we find no evidence in the record that demonstrates that Agent Hightower and Agent Davidson intended to mislead the magistrate. The affidavit sets forth dates when Cortez and Daub engaged in illegal activity. As to

these two deputies, the affidavit details a two-year pattern of extensive expenditures. It was therefore important to establish that Cortez and Daub were members of Majors 2 during the period in which those expenditures occurred. The videotape of the conduct of the Majors 2 team in the penthouse room demonstrated that Brown and Kaliterna were members of that unit at that time.

In addition, we find that Agent Hightower reasonably could have believed that three months was sufficient time for Brown to become involved in Majors 2 corruption. Although she joined Majors 2 only three months before the sting operation, Brown had been a deputy since 1972. She was, therefore, familiar with appropriate law enforcement conduct and booking procedures. More importantly, however, Brown's relatively brief tenure in Majors 2 did not affect the principal piece of evidence that Agent Hightower and Agent Davidson believed supported probable cause—namely, her illegal entry into the penthouse room and her observation of the $18,000 stolen by Bauder.

We REVERSE the order granting the motion to suppress because of our determination that the officers who obtained the warrant acted in good faith.