992 F.2d 1220
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
R.G. REYNOLDS, aka: Richard Fernando Gonzales; aka:
Richard Reynolds, Defendant-Appellant.
 No. 92-50017.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted March 3, 1993.
Decided April 29, 1993.
 
 Before SCHROEDER, THOMPSON and O'SCANNLAIN, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 OVERVIEW
 
 2
 R.G. Reynolds was convicted of thirteen counts of mail fraud, in violation of 18 U.S.C. § 1341; and two counts of witness tampering, in violation of 18 U.S.C. § 1512(b)(2)(B). He contends his convictions should be reversed because the district court: (1) demonstrated bias depriving him of a fair trial; (2) erred in denying his motion to suppress evidence gathered pursuant to eleven search warrants; (3) erred in denying his motion to dismiss the indictment due to pre-indictment delay; (4) erred in denying his motion for acquittal on the mail fraud counts because the government failed to prove misrepresentation; (5) erred in refusing to sanction the government for the late disclosure of Brady and Jencks Act material; and (6) erred in refusing to give an entrapment instruction on the witness tampering charges. He also contends that the government knowingly used perjured testimony against him. We have jurisdiction under 28 U.S.C. § 1291 and we affirm.
 
 FACTS
 A. Mail Fraud
 
 3
 Reynolds founded and operated an investment company known as R.G. Reynolds Enterprises. He held himself out as an investment advisor. He promoted his services by holding investment seminars in several states, direct telephone contact by his sales staff, television shows, a nightly radio show called "The Reynolds Rap" and a newsletter called "The Reynolds Report." He claimed to have earned prior clients returns of 48% per year.
 
 
 4
 Reynolds offered clients a number of investment programs. The one from which the mail fraud charges arose was called "Managed Accounts." He represented to clients who invested in this program that he would personally manage the funds deposited to obtain safe but rapid growth. He reported to them with periodic statements, usually showing exceptional earnings. There was evidence, however, that the statements were entirely fabricated and that Reynolds regularly converted the funds to pay personal or business expenses. There was also evidence that Reynolds regularly lied to clients about their earnings when they called about their accounts. Finally, there was evidence that Reynolds never set up accounts for his Managed Accounts clients, and that they lost much of their money.
 
 B. Witness Tampering
 
 5
 Helen Money was one of Reynolds's victims. She also became friends with him and they may have had a sexual relationship. In August 1987 Money attended Reynolds's wedding where he gave her a telegram for "safekeeping." The telegram purported to be an acknowledgement of Reynolds's order to have funds wired from a Swiss bank account.
 
 
 6
 In October 1990, Money was subpoenaed to appear before a grand jury and ordered to produce any documents she had from Reynolds. There was evidence that before her scheduled October 30, 1990 appearance, Reynolds attempted to persuade Money not to turn over the telegram. Instead, however, Money cooperated with the government and taped many of her conversations with Reynolds. Some of these tapes reveal efforts by Reynolds to persuade Money not to turn over the telegram.
 
 ANALYSIS
 A. Bias Argument
 
 7
 Reynolds first contends that Judge Real's bias denied him a fair trial. He points to several incidents from the record which he contends evidence this bias. In addition, he provides, without argument, extensive lists of citations to the record which he contends contain evidence of the judge's bias.
 
 
 8
 With regard to judicial bias, we have previously said:
 
 
 9
 A federal judge has broad discretion in supervising trials, and his or her behavior during trial justifies reversal only if [he or she] abuses that discretion. A trial judge is more than an umpire, and may participate in the examination of witnesses to clarify evidence, confine counsel to evidentiary rulings, ensure the orderly presentation of evidence, and prevent undue repetition. A judge's participation justifies a new trial only if the record shows actual bias or leaves an abiding impression that the jury perceived an appearance of advocacy or partiality.
 
 
 10
 United States v. Laurins, 857 F.2d 529, 537 (9th Cir.1988), cert. denied, 492 U.S. 906 (1989); see also United States v. Mares, 940 F.2d 455, 464 (9th Cir.1991); United States v. Mostella, 802 F.2d 358, 361 (9th Cir.1986).
 
 
 11
 We have reviewed each incident cited in the record. The record does not show actual bias, and we are not left with any impression of judicial advocacy or partiality. Accordingly, we reject Reynolds's judicial bias argument.
 
 B. Suppression Argument
 
 12
 Reynolds next contends that none of the eleven search warrants was supported by probable cause. He further contends that three of the warrants were not sufficiently particular in describing what to seize.
 
 
 13
 We review for clear error a magistrate's decision to issue a search warrant. United States v. Bertrand, 926 F.2d 838, 841 (9th Cir.1991). We decide whether there was a "substantial basis" for a finding of probable cause. United States v. Brown, 951 F.2d 999, 1002 (9th Cir.1991); United States v. Rodriguez, 869 F.2d 479, 484 (9th Cir.1989). However, we review de novo contentions that a search warrant fails to particularly describe the items to be seized. United States v. Hurt, 795 F.2d 765, 772 (9th Cir.1986), cert. denied, 484 U.S. 816 (1987); United States v. McClintock, 748 F.2d 1278, 1282 (9th Cir.1984), cert. denied, 474 U.S. 822 (1985).
 
 
 14
 In determining probable cause, "a magistrate need not determine that the evidence sought is in fact on the premises to be searched ..., or that the evidence is more likely than not to be found where the search takes place.... The magistrate need only conclude that it would be reasonable to seek the evidence in the place indicated in the affidavit." United States v. Peacock, 761 F.2d 1313, 1315 (9th Cir.) (emphasis in original) (citations omitted), cert. denied, 474 U.S. 847 (1985).
 
 
 15
 All eleven warrants were supported by affidavits relating information from confidential informants, SEC depositions, victim complaints, and postal investigations. These provided substantial evidence that Reynolds was engaged in fraudulent activity and that the locations to be searched might contain evidence of such activity.
 
 
 16
 Reynolds argues the affidavits relied on information from unreliable confidential informants. He does not explain why they were unreliable. Moreover, we look to the "totality of the circumstances" to determine whether there was a substantial basis for a finding of probable cause. Illinois v. Gates, 462 U.S. 213, 233 (1983). Here, the fact that there were several informants and that most of the relevant statements were corroborated by more than one informant suggests that the informants' testimony was reliable. In addition, the affidavits contained other information which justified finding probable cause. See id. This included information from the SEC investigation and complaints from victims.
 
 
 17
 Reynolds argues that even if the warrants were supported by probable cause, the three premises warrants did not describe with sufficient particularity the items to be seized. The description is the same in each of the three warrants. Each authorizes the seizure of "[m]aterials associated with the purported business and finances of R.G. Reynolds and his companies, and the investment opportunities offered or provided by R.G. Reynolds and/or his companies, including, but not limited to, the following...." The warrants list fifteen categories of business documents along with coins and gemstones and conclude with a catchall category of "[a]ny other evidence, fruits, or instrumentalities in violation of Title 18, United States Code, Section 1341, Mail Fraud; and Title 18, United States Code, Section 1343, Wire Fraud, and Title 15, United States Code, Sections 77q(a) and 77x, Securities Fraud."
 
 
 18
 While the warrants are broad, we have allowed a similarly broad warrant to stand in these circumstances. In a case very similar to this one, United States v. Offices Known as 50 State Dist., 708 F.2d 1371 (9th Cir.1983), cert. denied, 465 U.S. 1021 (1984), the warrant authorized the seizure of a wide variety of business records and materials along with "other evidence and instrumentalities for numerous on-going violations of Title 18, United States Code, Sections 1341 (Mail Fraud), 1342 (Fictitious Names) and 371 (Conspiracy)." Id. at 1372. We stated:
 
 
 19
 While the seizure was extraordinarily broad, and in that sense "general", under the particular facts of this case, the scope of the warrant was justified. It was not possible through more particular description to segregate those business records that would be evidence of fraud from those that would not, for the reason that there was probable cause to believe that fraud permeated the entire business operation of 50 State.
 
 
 20
 Id. at 1374. As in 50 State, the scope of the warrants here was necessary. The affidavits gave the magistrates reason to believe that Reynolds's businesses were "boiler room" operations, entirely devoted to fraudulent activity. As in 50 State, there was no way to separate out any potentially legitimate business documents or assets.
 
 
 21
 Nor are the warrants rendered invalid by the fact that they authorize seizure of items "including but not limited to" the categories listed. In United States v. Washington, 797 F.2d 1461 (9th Cir.1986), we approved this same language in a search warrant so long as the language was preceded by some appropriate limiting language. Here, only "[m]aterials associated with the purported business and finances of R.G. Reynolds" could be seized. This sufficiently limited the warrants.
 
 C. Pre-indictment Delay
 
 22
 Reynolds contends the indictment against him should have been dismissed due to pre-indictment delay. To obtain such relief, a defendant must meet the heavy burden of showing that he "suffered actual, non-speculative prejudice from the delay" and that "the delay, when balanced against the prosecution's reasons for it, offends those 'fundamental conceptions of justice which lie at the base of our civil and political institutions.' " United States v. Sherlock, 865 F.2d 1069, 1073 (9th Cir.1989), amended, 962 F.2d 1349 (9th Cir.), cert. denied, Charley v. United States, 113 S.Ct. 419 (1992). We review the district court's decision for abuse of discretion. United States v. Turner, 926 F.2d 883, 888 (9th Cir.), cert. denied, 112 S.Ct. 103 (1991); United States v. Rogers, 722 F.2d 557, 561 (9th Cir.1983), cert. denied, 469 U.S. 835 (1984).
 
 
 23
 Reynolds asserts that he was prejudiced by the delay because he was forced to make admissions and reveal his defenses to the SEC in a civil proceeding which preceded the indictment. This, he argues, disadvantaged him in his criminal trial. He does not say, however, what admissions or defenses he revealed in the civil proceeding, or how he was prejudiced by them. His claim of prejudice is entirely speculative.
 
 
 24
 The government asserts that it needed time for investigation. This is an appropriate reason for delay. United States v. Lovasco, 431 U.S. 783, 796 (1977). In Lovasco, even absent evidence on the record concerning the reasons for the delay, the Court accepted the prosecutor's representation that the delay resulted from the need for further investigation. Id. Here the prosecution represents that the delay was the result of serving over 100 subpoenas duces tecum on financial institutions, interviews with dozens of victims, employees, and associates of Reynolds, and extensive analysis of all this data. There is no reason to doubt this representation.
 
 
 25
 As Reynolds can merely speculate about his prejudice, and as the government had a good reason for the delay, the district court did not abuse its discretion in declining to dismiss the indictment.
 
 D. Failure to Prove Misrepresentation
 
 26
 Reynolds argues the government never proved that he hadn't earned earlier investors profits of at least 48% per year. The government concedes that it never proved this. Reynolds argues that proving that this statement was false was necessary to his conviction. We disagree.
 
 
 27
 The government proved other misrepresentations in furtherance of Reynolds's mail fraud scheme. For example, the government presented evidence that Reynolds falsely represented to investors that he would personally manage their money and invest it. At least some of this money was converted to Reynolds's personal and business use. Reynolds used some of it to pay gambling debts, gave some to his girlfriend, and used some to finance his radio and television shows and business operations, and to pay his personal living expenses. This evidence was sufficient to establish Reynolds's misrepresentations and the necessary predicate acts of fraud.
 
 E. Brady and Jencks Act Arguments
 
 28
 Reynolds next argues that 19 pages of handwritten notes made by Prince regarding her interview with Money were Brady and Jencks Act material. These notes were not turned over to the defense until just before closing arguments. Reynolds contends there is a reasonable probability that if these notes had been disclosed earlier he could have used this information to his advantage and could have avoided his conviction on the witness tampering charges.
 
 
 29
 "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment." United States v. Bagley, 473 U.S. 667, 669 (1985) (quoting Brady v. Maryland, 373 U.S. 83, 87 (1963)). "Impeachment evidence, ... as well as exculpatory evidence, falls within the Brady rule." Bagley, 473 U.S. at 676. Under both Brady and the Jencks Act, "[t]he evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." Id. at 682 (Brady ); United States v. Brumel-Alvarez, 976 F.2d 1235, 1246 (9th Cir.1992) (Jencks Act).
 
 
 30
 Reynolds contends that two portions of the notes could well have convinced the jury that he was entrapped. The first portion, he argues, indicates that Money admitted she had sex with him one night. The second, he contends, shows that the government supplied Money with a script for her to use to entrap him.
 
 
 31
 Reynolds makes three arguments in support of his contentions. First, he argues that a sexual encounter makes it more likely that Money could have entrapped him. Second, he contends that Money's admission, according to Prince's notes, that she had sex with him could have been used to impeach her because she answered "yes" at trial to the question, "In the course of these contacts did you become friends with the defendant?" Finally, he contends the notes show that Money had been provided with a "script" which the government used to instruct her on entrapping Reynolds. He argues that this "scripting" could have been used to impeach Money because she testified at trial that she had been given no specific instructions by the government.
 
 
 32
 Even assuming these arguments may be valid, there is no "reasonable probability" that the outcome of the trial in which Reynolds was convicted of the witness tampering charges would have been different if Prince's notes had been made available to the defense sooner. This is so because apart from Money's trial testimony, the recordings of her conversations with Reynolds conclusively establish that Reynolds tampered with this witness.
 
 
 33
 The first recorded instance of witness tampering involved a conversation in which Reynolds called Money on November 6, 1990. The relevant portion went as follows:
 
 
 34
 Money: (sigh) I want to ask you somethin'.
 
 
 35
 Reynolds: What?
 
 
 36
 Money: Does she know anything about that telegram?
 
 
 37
 Reynolds: No.
 
 
 38
 Money: Is she supposed to know?
 
 
 39
 Reynolds: No. That's privy.
 
 
 40
 Money: Privy ...
 
 
 41
 Reynolds: She knows nothin' about that. You need to destroy that. Just talk to her and see if you can do it over the phone. If not, they, they're gonna have to come out here.
 
 
 42
 No reasonable jury could find that Reynolds's demand that Money "destroy" the telegram did not amount to witness tampering or that Money did anything more than give Reynolds the opportunity to commit the crime. See Jacobson v. United States, 112 S.Ct. 1535, 1540 (1992) ("artifice or stratagem" may be used to catch those committing crimes, and merely providing the opportunity for a crime does not amount to entrapment).
 
 
 43
 The second recorded instance of witness tampering involved a conversation which took place on November 16, 1990. It went as follows:
 
 
 44
 Money: Well, hey listen, umm, umm, you know R.G. there's really a lot of things that's bother, bothering me really, really, really, bad. I was, you know, and the thing that I am really, is, I am really concerned about is all that stuff I got at my house that I have got to comply with whenever I go to that grand jury thing. And I'm tellin' you R.G., it's drivin' me crazy, because they stressed on me a jillion times that if I didn't bring that stuff in, I was going to be in contempt of court. And I don't know what to do with it.
 
 
 45
 Reynolds: Well, if it's, when, if it's not there, then it's not there! People throw things away all the time over the years.
 
 
 46
 Money: Well that's true, but it's there! That's the problem.
 
 
 47
 Reynolds: They don't know that!
 
 
 48
 Money: And especially like that, that telegram.
 
 
 49
 Reynolds: Well, that's mine. I already told you that. You cannot give somethin' that's not yours.
 
 
 50
 Money: It, when it's in my possession!
 
 
 51
 Reynolds: It's not yours.
 
 
 52
 Money: But it says "in my possession."
 
 
 53
 Reynolds: And I also told you to destroy it. I'm tellin' you right now that it's my, mine, and I want you to destroy it.
 
 
 54
 As in the previous conversation, Money did no more than give Reynolds the opportunity to commit the crime. In view of the evidence of the recorded conversations between Reynolds and Money, no rational jury could have found that Reynolds was entrapped.
 
 
 55
 Finally, whatever prejudice Reynolds may have suffered by being unable to cross-examine Money with Prince's notes when she testified at trial was effectively dispelled when the court offered to recall Money so that Reynolds could attempt to impeach her with the notes. See United States v. Span, 970 F.2d 573, 582-83 (9th Cir.1992). Despite repeated offers by the court to recall Money, Reynolds decided he did not want her brought back.
 
 F. Use of Perjured Testimony Argument
 
 56
 Reynolds argues that Money's testimony: (1) that she and Reynolds were "friends"; and (2) that she was not given specific instructions by the government, was perjured and knowingly used by the government. We reject this argument.
 
 
 57
 As to the first statement, Money simply answered "yes" to the question, "In the course of these contacts did you become friends with the defendant?" This is not perjury even if she did have sex once with him. At worst the answer was incomplete. See United States v. Schulman, 817 F.2d 1355, 1360-61 (9th Cir.1987) (It is not perjury to give an ambiguous answer to a question; it is the attorney's job to pin down a defendant to giving a precise answer to a precise question. Perjury requires that the there be a stark contrast between the truth and the allegedly perjurious statement.), cert. dismissed, 483 U.S. 1042 (1987); United States v. Cowley, 702 F.2d 1037, 1043-44 (9th Cir.1983) (same).
 
 
 58
 As to the second statement, regarding whether Money was given specific instructions, Reynolds offers no evidence that Prince ever gave, read, or showed any "script" to Money. Reynolds has produced absolutely no evidence of perjury.
 
 G. Entrapment Instruction Argument
 
 59
 Finally, Reynolds contends that the district court's failure to give an entrapment instruction requires reversal of the witness tampering convictions.
 
 
 60
 There is an unresolved split in this circuit as to whether the refusal to give an entrapment instruction is reviewed for abuse of discretion or de novo. United States v. Sotelo-Murillo, 887 F.2d 176, 179-80 (9th Cir.1989). However, under either standard the district court did not err in refusing to instruct the jury on entrapment.
 
 
 61
 "A defendant is entitled to an entrapment instruction if he or she can present some evidence that ... a government agent induced him or her to commit an illegal act." Id. at 179. That done, the burden shifts to the government to "prove beyond a reasonable doubt that the defendant was disposed to commit the criminal act prior to first being approached by Government agents." Jacobson v. United States, 112 S.Ct. 1535, 1540 (1992).
 
 
 62
 Reynolds argues that Money, at the request of the government, induced him to ask her to destroy a relevant telegram she had in her possession. As we have stated, no reasonable jury could have found entrapment from the conversation surrounding Reynolds's two charged attempts to get Money to destroy the telegram. Reynolds points to another portion of his conversation with Money in support of his entrapment argument. This portion is as follows:
 
 
 63
 Reynolds: So what, what was the major thing in the grand jury that they were askin' ya?
 
 
 64
 Money: Everything under the sun. And they want every piece of paper I have, and, ah, they wanna to know about your assets, they wanna know where money is, they want to know if there's any foreign banks. If there's, and that reminds me, there's that piece of paper that, that I have at home. You know that telegram that you gave me a long time ago?
 
 
 65
 Reynolds: Huh, huh, best you, huh, huh, best you do whatever.
 
 
 66
 Money: Best I do what?
 
 
 67
 Reynolds: Huh, well that's not around.
 
 
 68
 Money: Huh?
 
 
 69
 Reynolds: That's not there. It never has been.
 
 
 70
 Money: Oh it hasn't. Oh, I see. Well anyway, they, they, um, well I don't know what I'll do. Uh....
 
 
 71
 Reynolds: What the hell does that mean?
 
 
 72
 Money: Well I don't know what I'll do! I'm supposed to be under subpoena to produce it! And I don't know what you do. I don't know whether I'll lie to 'em or what.
 
 
 73
 Reynolds: Fuck! You jerk! What are you crazy?
 
 
 74
 Reynolds contends that in the last line of the foregoing portion of the recording he was emphatically protesting the idea that Money might refuse to produce the telegram. In light of what precedes it, this is not a reasonable interpretation. In fact, Reynolds had attempted to induce Money not to produce the telegram even before the line he points to.
 
 
 75
 There is no evidence of inducement. The district court did not err in refusing to give an entrapment instruction.
 
 
 76
 AFFIRMED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3