### UNITED STATES of America

v.

**John F. "Duffy" CONLEY, William C. Curtin, Sheila F. Smith, John Francis "Jack" Conley, Thomas "Bud" McGrath, Mark A. Abbott, Thomas Rossi, William Steinhart, Roberta Fleagle, Robin Spratt, Monica C. Kail, William J. Reed, Joanne T. Smith, Kenneth "Ron" Goodwin, Lawrence N. "Neudy" Demino, Sr., Christopher "Chris" Kail, Frank Garofalo, Thomas D. Ciocco, Michael Sukaly, Phillip M. "Mike" Ferrell, Anestos "Naz" Rodites and William E. Rusin, Defendants.**

Crim. No. 91–178.

United States District Court, W.D. Pennsylvania.

Feb. 3, 1993.

---

Thomas W. Corbett, Jr., U.S. Atty., W.D. Pa., and James R. Wilson and Paul E. Skirtich, Asst. U.S. Attys., Pittsburgh, PA, for plaintiff.

James Wymard, William Difenderfer, Ellen Viakley, Gary Gerson, Anthony Mariani, Lee Markovitz, Ray Radakovich, Stanley Greenfield, Martha Bailor, Frank W. Ittel, Jr., Raymond M. Maloney, John Zagari, Foster Stewart, Edward J. Osterman, Carl M. Janavitz, Carmen A. Martucci, Joel Johnston, John Goodrich, Vincent Baginski, Samuel J. Reich, William Acker, Joseph Kanfoush, Michael Foglia, Carl Parise and Caroline Roberto, Pittsburgh, PA, for defendants.

MEMORANDUM OPINION

LEE, District Judge.

Before the Court is the issue of the suppression of the fruits of a September 23, 1988 search of a building located at 930 Saw Mill Run Boulevard.

## I. Standing

### A. *Findings of Fact*

1. In September 1988, 930 Saw Mill Run Boulevard ("930 Saw Mill Run" or "the premises") was a two-story, brown-brick building located between a gasoline station and a salt or cinder pile in a strip of commercial properties. The words "Conley Motor Freight" were painted on the outside of the building.

2. The building had two entrances, one facing the street and one in the rear of the building. The front door could be unlocked from the outside, and the first floor office space could be accessed by the use of a second key. The back entrance consisted of a storm door and an inner door. The back entrance could not be unlocked from the outside.

3. "No trespassing" signs were posted in the front door, the back door and a window on the right side of the building (viewed from the street). Persons seeking to enter the premises were directed by a sign to the back entrance.

4. Inside the back doors was a storage room. Beyond the storage room, through another doorway, was the first floor office space. The second story also contained office space.

5. Defendant John Francis "Jack" Conley ("Jack Conley") owned the real estate and building comprising the premises.

6. Two businesses occupied the premises: Conley Motor Freight, a steel hauling and trucking business, and Duffy Vending Company ("Duffy Vending"), a vending company.

7. Jack Conley owned Conley Motor Freight. He had two employees. One worked in the first-floor office space, and the other worked in a garage in the same building. Six or seven independent truckers were associated with Conley Motor Freight. They each made an average of two visits per week to the premises.

8. Jack Conley maintained a desk in the first floor office space of the premises, situated near the right-side window to afford him a view of persons entering and exiting the premises.

9. Jack Conley worked at the premises on a daily basis, spending a considerable amount of time there each week.

10. Conley Motor Freight's business at the premises was conducted by telephones registered to Conley Motor Freight. Conley Motor Freight did not solicit walk-in business at the premises in any manner.

11. Defendant John F. "Duffy" Conley ("Duffy Conley"), Jack Conley's son, owned Duffy Vending. Defendants Sheila F. Smith and William C. Curtin were employees of Duffy Vending. Defendant Sheila Smith and one Helen Grosskopf worked at the premises as full-time secretaries.

12. Duffy Conley, as owner of Duffy Vending, maintained operational control over its business and records. All Duffy Vending business records were maintained at the premises.

13. Duffy Conley had a desk in the first-floor office space of the premises, in which he kept customer contracts, bills, notes and agreements. In a filing cabinet next to his desk, he kept checkbooks, canceled checks, bank statements and deposit slips.

14. Helen Grosskopf and Sheila Smith each had a desk on the premises and maintained Duffy Vending records in their desks.

15. William Curtin did not have a desk on the premises.

16. Duffy Conley worked at the premises at least forty-five minutes a day, five days a week. He occasionally worked there on evenings and weekends. He reviewed and balanced customer accounts using all the records maintained on the premises.

17. Duffy Vending did not solicit walk-in business in any manner. No showroom

existed on the premises, and customers were not invited to the premises.

18. Persons who regularly frequented the premises were limited to Jack Conley, his two employees, the independent truckers, Duffy Conley, Sheila Smith, Helen Grosskopf and Patrick Barth, a United Parcel Service driver who made deliveries an average four times a week.

19. Occasionally, other employees of Duffy Vending visited the premises, as did personal friends of Jack Conley.

20. The indictment charges that William C. Curtin had an interest in and much supervisory control over the charged illegal gambling business. Specifically, it charges that he was the general manager of Duffy Vending Co. Indictment at 2, ¶ 3. It charges that he, among others, conducted, managed and owned an illegal gambling business. *Id.* at 8, ¶ 21(a), 34. It further charges that he and Duffy Conley used the proceeds of the illegal gambling business to pay cash supplements to the employees of Duffy Vending. *Id.* at 14, ¶ 32.

21. Jack Conley had a subjective expectation that the premises would remain free from private and governmental intrusions.

22. Duffy Conley had a subjective expectation that the premises would remain free from private and governmental intrusions.

23. Sheila Smith had a subjective expectation that the premises would remain free from private and governmental intrusions.

### B. *Conclusions of Law*

■ 24. "Whether these defendants can demonstrate an invasion of their own Fourth Amendment privacy interests 'depends not upon a property right in the invaded place but upon whether the person who claims the protection of the amendment has a legitimate expectation of privacy in the invaded place.'" *United States v. Acosta*, 965 F.2d 1248, 1256 (3d Cir.1992) (emphasis deleted) (quoting *Rakas v. Illinois*, 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978)). Standing to challenge a search cannot be founded only on a legitimate expectation of privacy in the *items* seized; there must be a legitimate expectation of privacy in the *areas* searched. *United States v. Leary*, 846 F.2d 592, 595 (10th Cir.1988).

■ 25. Notwithstanding the use of the word "houses" in the Fourth Amendment, persons may have a legitimate expectation of privacy in commercial premises. *See Mancusi v. DeForte*, 392 U.S. 364, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968); *See v. City of Seattle*, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967); *United States v. Chuang*, 897 F.2d 646, 649–50 (2d Cir.), *cert. denied*, 498 U.S. 824, 111 S.Ct. 77, 112 L.Ed.2d 50 (1990); *Leary*, 846 F.2d at 595–96; *see also United States v. Forsythe*, 560 F.2d 1127, 1132 n. 5 (3d Cir.1977).

■ 26. One seeking to challenge a search of a commercial premises bears the burden of establishing a reasonable expectation of privacy. *See Rakas*, 439 U.S. at 130 n. 1, 99 S.Ct. at 424 n. 1; *Acosta*, 965 F.2d at 1256 n. 9. This entails establishing that the challenger had a subjective expectation of privacy in the searched premises and that the expectation of privacy is "one that society accepts as reasonable." *Chuang*, 897 F.2d at 649.

■ 27. Whether an expectation of privacy is reasonable depends on several factors. Courts have looked at whether the challenger had a property or possessory interest, *id.*, whether the area searched or items seized were knowingly exposed to the public, *California v. Greenwood*, 486 U.S. 35, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988); *Oliver v. United States*, 466 U.S. 170, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984), whether a commercial premises is part of a " 'closely regulated' industr[y]," *New York v. Burger*, 482 U.S. 691, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987), and whether there is a significant relationship between the area searched and the challenger's work spaces. *Chuang*, 897 F.2d at 649.

■ 28. Jack Conley owned the land and building, as well as Conley Motor Freight and all its materials on the premises. Duffy Conley owned all of the Duffy Vending materials on the premises, and had a possessory interest through those

materials. Additionally, Duffy Conley maintained his own desk on the premises, and had daily access to the desks of Sheila Smith and Helen Grosskopf. Sheila Smith, as a full-time secretary of Duffy Vending, occupied the premises all day of every business day as a part of her secretarial and record-keeping duties. Because only five persons regularly worked within the relatively small office area occupied by these two family businesses, there is a significant nexus between each person's work spaces and the premises as a whole.

29. The limited number of persons frequenting the premises on a regular basis, the lack of solicitation of walk-in business, the posting of "no trespassing" signs and Jack Conley's monitoring of persons entering and leaving the premises demonstrates that the premises were not knowingly exposed to the public.

30. Neither the trucking business nor the vending business are "closely regulated industries" in any relevant sense. *Cf. Chuang,* 897 F.2d at 650–51 (no reasonable expectation of privacy in bank records subject to statutorily mandated bi-annual government review).

31. This Court concludes that the subjective expectations of privacy of Jack Conley, Duffy Conley and Sheila Smith ones that society accepts as reasonable.

32. Because the record shows no substantial connection, by way of a desk, office, property or regular presence, between William Curtain and the premises of 930 Saw Mill Run Boulevard, the Court concludes that he cannot have a reasonable expectation of privacy sufficient to challenge the search, whatever his subjective expectations may have been. *Cf. Leary,* 846 F.2d at 595 ("There is no doubt that a corporate officer or employee may assert a reasonable or legitimate expectation of privacy in *his* corporate office") (emphasis added).

## II. Probable Cause

### A. *Findings of Fact*

33. On September 23, 1988, Detective John Bosetti of the City of Pittsburgh police presented to District Justice Anne Marie Sharding an application and affidavit of probable cause for a search warrant for premises located at 930 Saw Mill Run Boulevard.

34. After reviewing the warrant, a process that took between fifteen and thirty minutes, the District Justice issued the warrant. No other warrant applications were before the District Justice at the time Detective Bosetti presented the warrant application and affidavit.

35. As part of process of issuance, the District Justice administered an oath to Detective Bosetti regarding the truth of the averments in the affidavit.

36. The District Justice read the affidavit, but asked no questions of Detective Bosetti regarding it. Detective Bosetti did not orally supplement the facts in the affidavit.

37. The search warrant described the structure to be searched and authorized the seizure of:

All video poker machines, keys for machines, accounting records, all revenue records, employee records, purchase orders from distributors and manufactors [sic] of video poker machines, all records showing poker machine locations and any and all paraphernalia indicative of a gambling operation.

38. The affidavit of probable cause section of the Application for Search Warrant consisted of the following:

In June of 1988, affiant began an investigation into a gambling operation, involving video poker machines. During this time frame, affiant and other Dets [Detectives] from the Pittsburgh Police Organized Crime Unit, visited over fifty (50) various locations, throughout the city of Pittsburgh, that contained video poker machines. Dets were able to play, at random, these poker machines and received cash payments/pay-offs for credits they had accumulated, in fortynine [sic] different locations. During this period, Dets observed numerous cash payoffs to other individuals that were playing poker machines and had aquired [sic]

the set amount of credits needed. A detailed accounting of every location is given in each affidavit for search warrant. The City of Pgh, requires a permit for anytype [sic] of video/mechanical amusement device that is placed inside a particular business and made available to the public. Once the establishment registers, they are given a plaque which must be placed inside the premises so it can be viewed by the public. Dets found that of the 49 locations visited, 42 listed Duffy's Vending Co as the owner of the video poker machines. Dets then examined the permit application form, from these 42 locations and found that Duffy's Vending Co., lists it's business address as 930 Sawmill Run Blvd., Pgh, Pa. 15220.

On Sep [sic] 15, 1988, affiant observed a Ford pick-up truck transporting a load, of what appeared to be video devices, covered in black plastic. For intelligence purposes, affiant checked the registration plate, Pa # YC–42550 and found it to be registered to Duffy's Vending Co., 930 Sawmill Run Blvd.

The telephone number, 431–6582, is listed as the telephone number for Duffy's Vending Co., as stated on the application for the City of Pgh license permits. Affiant called this number on Sep [sic] 22, 1988 and found it to be answered, "Duffy's Vending". Affiant checked the Bell of Pa yellow pages, both Consumer and Business to Business, but found no listing for Duffy's Vending Co.

On March 16, 1988, John Duffy Conley was found guilty for violating Sec # 5513, of the Pa Crimes Code, Gambling Devices. John Duffy Conley is listed as the individual owner of Duffys [sic] Vending Co. This conviction was a result of an investigation, inwhich [sic] affiant participated in, that lead to Conleys [sic] arrest for his involvement in the Slovak Civic Federation of Allegheny County, AKA Slovak Club. In summary, Dets entered the Slovak Club on various times allowing them to play various machines. They were able to obtain a cash payoff after accumulating the required amount of credits on the video poker machines.

Based on the above information, affiant concludes that the business address of Duffy's Vending Co., is 930 Sawmill Run Blvd., Pittsburgh, Pa. 15220 and request [sic] that this search warrant be issued in an effort gain a better insight into the internal works of this gambling operation. Therefore I request that a search warrant be issued.

39. The section of the Application for Search Warrant that asks for the "Crime which has been or is being committed" reads "Sec # 5513 Gambling Devices."

40. The Court notes that Title 18, Pennsylvania Consolidated Statutes Annotated, Section 5513 provides in relevant part:

§ 5513. Gambling devices, gambling, etc.

(a) Offense defined.—A person is guilty of a misdemeanor of the first degree if he:

(1) *intentionally or knowingly* makes, assembles, sets up, maintains, sells, lends, leases, gives away, or offers for sale, loan, lease or gift, any punch board, drawing card, slot machine or any device to be used for gambling purposes, except playing cards;

(2) allows persons to collect and assemble for the purpose of unlawful gambling at any place under his control;

(3) solicits or invites any person to visit any unlawful gambling place for the purpose of gambling; *or*

(4) being the owner, tenant, lessee or occupant of any premises, knowingly permits or suffers the same, or any part thereof, to be used for the purpose of unlawful gambling.

18 Pa.Cons.Stat.Ann. § 5513(a) (Purdon 1983) (emphasis added).

41. The Court notes the two ways in which a person can violate Section 5513(a)(1) by means of a video poker machine: by intentionally or knowingly making, assembling, setting up, maintaining, selling, lending, leasing or giving away (1)

a device that is a gambling device *per se*, or (2) a device intended to be used for gambling purposes. *See Commonwealth v. Twelve Dodge City Video Poker Mach.*, 517 Pa. 363, 365–67, 537 A.2d 812, 813–14 (1988); *Commonwealth v. Two Elec. Poker Game Mach.*, 502 Pa. 186, 191–92 & nn. 1 & 2, 197–98, 465 A.2d 973, 975–76 & nn. 1 & 2, 979 (1983);[1] *Commonwealth v. Bretz*, 289 Pa.Super. 259, 264 n. 5, 433 A.2d 55, 58 n. 5 (1981) (citing cases); *Commonwealth v. Rose*, 257 Pa.Super. 514, 516–17, 390 A.2d 1356, 1357 (1978).

42. The determination of whether a machine is a gambling device *per se* "will turn on the characteristics of the machine when read against the three elements necessary to gambling: consideration, a result determined by chance rather than skill, and a reward. If the machine displays all three qualities, it will then be 'so intrinsically connected with gambling' as to be a gambling device *per se*." *Two Elec. Poker Game Mach.*, 502 Pa. at 194, 465 A.2d at 977.

43. The Pennsylvania Supreme Court has determined that video poker machines meet the consideration and chance elements. 502 Pa. at 194–196, 465 A.2d at 977–78. Nonetheless, absent a "knock down" button, which removes accumulated credits, and a meter, which records the number of credits knocked down, the element of reward is lacking, and the machine does not qualify as a gambling device *per se*. 502 Pa. at 197–98, 465 A.2d at 979. That a machine is readily converted, by the addition of a knock down button and meter, to a *per se* gambling device does not make the machine a gambling device *per se*. *Twelve Dodge City Video Poker Mach.*, 517 Pa. at 367, 537 A.2d at 814.

44. The affidavit does not aver that Duffy Conley or any employee of Duffy Vending Co. was involved in any of the payoffs on video poker machines at the forty-nine locations where Detectives received and observed payoffs ("pay-off locations").

45. The affidavit does not aver that video poker machines were ever on the premises of 930 Saw Mill Run Boulevard.

46. The affidavit does not aver that video poker machines were ever observed entering or leaving the premises.

47. The affidavit does not aver that the video poker machines at the forty-nine pay-off locations were equipped with knock-off buttons or meters.

48. The affidavit does not aver the method in which the video poker machines were used in connection with the illegal pay-offs received and observed at the pay-off locations, *i.e.*, whether the video poker machines were illegal gambling devices *per se* or merely amusement devices operated in illegal gambling activities.

49. The affidavit makes no representation as to when applications were filed for the City of Pittsburgh video amusement device permits that were on display in June of 1988.

50. The City of Pittsburgh video amusement device permits were issued to Duffy Vending Co. in February 1988, seven months prior to the application and affidavit of probable cause for a search warrant.

51. Duffy Vending Co. filed the applications for the video amusement device permits in December 1987, nine months prior to the application and affidavit of probable cause for a search warrant.

52. Other than the averments regarding the City of Pittsburgh video amusement device permits, the affidavit does not aver facts showing that Duffy Vending Co. owned the video poker machines at forty-two of the forty-nine pay-off locations.

53. The affidavit does not aver any facts showing that Duffy Vending Co.

---

1. These Pennsylvania Supreme Court cases apply 18 Pa.Cons.Stat.Ann. § 5513(b), which provides:

  (b) Confiscation of gambling devices.
  —Any gambling device possessed or used in violation of the provisions of subsection (a) of this section shall be seized and forfeited to the Commonwealth. All provisions of law relating to the seizure, summary and judicial forfeiture, and condemnation of intoxicating liquor shall apply to seizures and forfeitures under the provisions of this section.
18 Pa.Cons.Stat.Ann. § 5513(b) (Purdon 1983).

maintained the video poker machines at forty-two of the forty-nine pay-off locations.

54. The affidavit makes no representation as to the date of Duffy Conley's activities that led to his March 16, 1988 conviction.

55. The affidavit does not aver any connection between the Slovak Civic Federation of Allegheny County and the forty-two pay-off locations using Duffy Vending Co. video poker devices, nor does it set forth the specific capacity in which Duffy Conley was involved with the Slovak Club.

56. In a separate state court prosecution against Duffy Conley, the Court of Common Pleas of Allegheny County, Pennsylvania ("the Suppression Court") suppressed the evidence seized pursuant to the September 23, 1988 warrant for the executing officer's failure to knock and announce their presence.[2]

57. The Suppression Court nonetheless stated that September 23, 1988 warrant was supported by probable cause.[3]

### B. *Conclusions of Law*

■ 58. Probable cause for searching a particular place exists in an affidavit when the affidavit sets forth facts constituting a substantial basis for finding a fair probability that first, a crime has been committed, and second, the particular place may contain the fruits, instrumentalities or evidence of the crime committed. *See Illinois v. Gates*, 462 U.S. 213, 236, 238–39, 103 S.Ct. 2317, 2331, 2332–33, 76 L.Ed.2d 527 (1983); *Steagald v. United States*, 451 U.S. 204, 213, 101 S.Ct. 1642, 1648, 68 L.Ed.2d 38 (1981); *Zurcher v. Stanford Daily*, 436 U.S. 547, 558, 98 S.Ct. 1970, 1977, 56 L.Ed.2d 525 (1978); *Brinegar v. United States*, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949); *Dumbra v. United States*, 268 U.S. 435, 441, 45 S.Ct. 546, 548–49, 69 L.Ed. 1032 (1925).

■ 59. Judicial officers reviewing an application for a search warrant are to test the facts set forth in the affidavit of probable cause under a "totality of the circumstances" test in determining whether probable cause to issue a search warrant exists. *Illinois v. Gates*, 462 U.S. at 238–39, 103 S.Ct. at 2332–33. Specifically:

[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for ... conclud[ing]" that probable cause existed.

---

**2.** The Suppression Court's opinion, the pages of which are unnumbered, is included in the record of this case. Pretrial Motions of John F. "Duffy" Conley, Exhibit I (Document No. 377). The Suppression Court's reasoning on the knock and announce issue is found at unnumbered pages 10–15. His conclusion and order on this issue is found at unnumbered page 22, the relevant portion of which reads simply, "The search warrants for the 930 Saw Mill Run and Windgap/Berry Street locations were illegally executed given that police failed to knock and announce their authority and purpose prior to entry. Thus, those warrants are ordered suppressed."

**3.** The Suppression Court's reasoning on the probable cause issues in the state court case reads, in its entirety, as follows:

Defense counsel raised the issue as to the probable cause for issuance of search warrants in this case. To restate the circumstances involved herein, there were 54 warrants issued on the morning of 9/22/88. 47 warrants were issued on the afternoon of 9/22/88. One warrant was issued for 930 Saw Mill Run on 9/23/88. Six warrants were issued on November 9, 1988. Three warrants were issued on 1/27/89.

In light of this Court's earlier ruling suppressing the warrant and evidence seized pursuant thereto, this Court made no finding as to the adequacy of probable cause in the 101 warrants issued on 9/22/88, the issue being moot due to that ruling. As to the other 10 search warrants, this Court finds that after review of the four corners and all the probable cause set forth therein, and in light of the various and numerous decisions of the appellate courts in this matter, that these warrants contained adequate and sufficient probable cause. Defendant counsel's motion to suppress as to these issues was denied.
Unnumbered pp. 21–22.

*Id.* (quoting *Jones v. United States,* 362 U.S. 257, 269, 80 S.Ct. 725, 735, 4 L.Ed.2d 697 (1960)).

■■■ 60. A court reviewing the issuing magistrate's determination that probable cause exists must exercise great deference in its review. *Gates,* 462 U.S. at 238, 103 S.Ct. at 2332. A court reviewing the issuing magistrate's determination that probable cause exists should read the affidavit's language in context and as a whole, and not in isolation or in the abstract. *United States v. Johnson,* 690 F.2d 60, 64 (3d Cir.1982), *cert. denied,* 459 U.S. 1214, 103 S.Ct. 1212, 75 L.Ed.2d 450 (1983). A judicial officer is entitled to draw reasonable inferences about where evidence is likely to be found, based upon the nature of the crime and the evidence sought. *United States v. Malin,* 908 F.2d 163, 166 (7th Cir.), *cert. denied,* 498 U.S. 991, 111 S.Ct. 534, 112 L.Ed.2d 544 (1990).

■■■ 61. The application and affidavit of probable cause for search warrant may have provided a substantial basis for probable cause to believe that each of forty-nine establishments was using video poker machines in distinct, illegal gambling operations.

62. The application and affidavit of probable cause for search warrant may have provided a substantial basis for probable cause to believe that forty-two of the forty-nine pay-off locations used Duffy Vending video poker machines in distinct, illegal gambling operations.

63. Given the on-going legal relationship among Duffy Vending Co., the City of Pittsburgh and the proprietors of the locations created by the City's permit requirements, the current display in June 1988 of permits listing Duffy Vending Co. as the owner of video poker machines is a substantial basis for concluding that Duffy Vending continued to own the machines on September 23, 1988. Given the relationship of the parties in this regard, the ownership information contained in the permits was not stale, though it was furnished to the City in December 1987.

■■■ 64. That Duffy Conley was convicted under 18 Pa.Cons.Stat.Ann. § 5513 is not stale information; ten years from now, Conley will have been convicted under Section 5513 on March 16, 1988.

65. Duffy Vending Co.'s ownership of video poker machines in forty-two of forty-nine locations, coupled with Duffy Conley's March 16, 1988 conviction, the specific nature and date of the underlying conduct being unspecified and unconnected to any pay-off location referenced in the affidavit, is not a substantial basis for concluding that the proprietors of the forty-two pay-off locations using Duffy Vending Co. video poker machines were joined in a common purpose amongst themselves or with Duffy Conley or Duffy Vending Co. The affidavit does not contain a substantial basis for believing that the operators of the forty-two pay-off locations were part of a gambling conspiracy. The affidavit's reference to "this gambling operation" is a bare conclusion.

66. There is no basis for concluding that Duffy Conley, Duffy Vending Co. or any employee thereof knew or intended that Duffy Vending Co. video poker machines would be used as illegal gambling devices at any of the 42 locations that paid off on *Duffy Vending Co.* machines.

67. There is no basis for concluding that the Duffy Vending Co. video poker machines in place at forty-two of the forty-nine pay-off locations were illegal gambling devices *per se.*[4]

68. The District Justice had no substantial basis for concluding that Duffy Conley, Duffy Vending Co. or any of his/its employees were violating Section 5513.

---

**4.** On the importance of knock-off switches and meters and gambling machines *per se* to probable cause to search for evidence of gambling activity, see *Commonwealth v. Alewine,* 384 Pa.Super. 283, 287, 558 A.2d 542, 544 (1989) (reversing the trial court's determination that the affidavit failed to indicate an on going activity by finding "that the trial court has failed to perceive the importance of the fact that there was reason to believe that [the defendant] was in possession of a per se gambling device and not just that he was suspected of permitting gambling activity on the premises"), *alloc. denied,* 524 Pa. 624, 574 A.2d 66 (1990).

69. The District Justice had no substantial basis for concluding that evidence of a Section 5513 violation could be found on the premises of 930 Saw Mill Run Boulevard.

70. The application and affidavit for search warrant did not set forth probable cause to search the premises of 930 Saw Mill Run Boulevard.

71. The September 23, 1988 search of 930 Saw Mill Run Boulevard was in violation of the Fourth and Fourteenth Amendments of the Constitution of the United States.

### III. The *Leon* Good Faith Exception to the Exclusionary Rule

#### A. *Discussion*

72. Evidence seized in a search illegal under the Constitution of the United States, conducted by a law-enforcement officer relying in objective good faith upon a judicial officer's issuing of a warrant, is not subject to the federal exclusionary rule. "[T]he marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion." *United States v. Leon*, 468 U.S. 897, 922, 104 S.Ct. 3405, 3420, 82 L.Ed.2d 677 (1984).

73. The Supreme court in *Leon* delineated four circumstances in which the exclusionary rule is still appropriate, stating:

> Suppression therefore remains an appropriate remedy if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his disregard of the truth.... The exception we recognize today will also not apply in cases where

the issuing magistrate wholly abandoned his judicial role ...; in such circumstances, no reasonably well trained officer should rely on the warrant. Nor would an officer manifest objective good faith in relying on a warrant based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." ... Finally, depending on the circumstances of the particular case, a warrant may be so facially deficient—*i.e.*, in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid.

*Id.* at 923, 104 S.Ct. at 3421 (citations omitted). The Government bears the burden of establishing the good faith exception to the federal exclusionary rule. *Id.* at 924, 104 S.Ct. at 3421.

#### *Facially inadequate probable cause.*

74. As the Defendants assert that objectively reasonable reliance upon the warrant issued by the District Justice was not possible, the Court is faced with the task of determining whether or not the warrant, which failed to include facts constituting a substantial basis for concluding that there was a fair probability that evidence of a crime could be found on the premises, was so lacking in indicia of probable cause that official reliance on it was entirely unreasonable.

75. The Court has reviewed the law of the Third Circuit, but it has not found any case addressing this particular aspect of the good faith exception to the exclusionary rule.[5] The Court turns, then, in addition to the decisions of the Supreme Court of the United States, to decisions from other Courts of Appeal for guidance.[6] From

---

5. Only two Third Circuit cases were found that applied the good faith exception to the exclusionary rule to admit unconstitutionally seized evidence, *United States v. American Investors of Pittsburgh, Inc.*, 879 F.2d 1087 (3d Cir.), *cert. denied*, 493 U.S. 955, 110 S.Ct. 368, 107 L.Ed.2d 354 (1989); and *United States v. Kepner*, 843 F.2d 755 (3d Cir.1988). In both cases the court found that the warrant had issued upon probable cause, and applied *Leon* to designations of

items to be seized that were overbroad or inadequately particularized.

6. Cases from the different circuits may appear unequally represented in the ensuing discussion. There is a simple reason for this. The approach pursued in deciding *Leon*-type cases determines whether a body of precedent is created distinguishing the "mere" lack of probable

its reading of the pertinent case law, the Court has distilled the principles that it will expound and apply in this case.

76. " 'If the purpose of the exclusionary rule is to deter unlawful police conduct, then evidence obtained from a search should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment.' " *Id.* at 919, 104 S.Ct. at 3419 (quoting *United States v. Peltier,* 422 U.S. 531, 542, 95 S.Ct. 2313, 2320, 45 L.Ed.2d 374 (1975)). Officers are charged with a "reasonable knowledge of what the law prohibits." *Leon,* 468 U.S. at 919–20 n. 20, 104 S.Ct. at 3419 n. 20.

77. As officials are charged with a reasonable knowledge of what the Constitution forbids, courts have identified rules of law violated by the issuance of a warrant and asked whether a reasonable officer would know that the warrant was voided by the rules of law. *United States v. Skinner,* 972 F.2d 171, 174–75 (7th Cir. 1992); *United States v. Brown,* 951 F.2d 999, 1005–06 (9th Cir.1991); *United States v. Johns,* 948 F.2d 599, 605–06 (9th Cir. 1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 3046, 120 L.Ed.2d 913 (1992); *United States v. Weber,* 923 F.2d 1338, 1346 (9th Cir.1991) (as amended on denial of rehearing and modification); *Malin,* 908 F.2d at 166–67; *United States v. Corral–Corral,* 899 F.2d 927, 932, 937 (10th Cir.1990); *United States v. Freitas,* 856 F.2d 1425, 1430 (9th Cir.1988) (*Freitas II*).

78. The Ninth Circuit has recently acknowledged that this approach, which was treated as a guide to the *Leon* inquiry, is akin to the analysis of the "objective legal reasonableness" required for an official's qualified immunity in civil rights cases. *Brown,* 951 F.2d at 1006 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 819, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). The Ninth Circuit ruled that, in accordance with the Supreme Court's qualified immunity case *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987), the legal rule that is violated must be "clearly established" at the time of the issuance of a warrant before reliance on the warrant can be found to be objectively unreasonable. *Brown,* 951 F.2d at 1006. The Court adopts this approach.

79. At the time the affidavit and application for search warrant was presented to the District Justice in this case, the scope of the criminal prohibitions contained in 18 Pa.C.S.Ann. § 5513(a) were clearly established. *See* paragraphs 40–43, *supra.*

80. It had been long and clearly established that probable cause for searching a particular place consists in facts that would warrant a reasonable person in the belief that first, a crime has been committed, and second, the particular place may contain the fruits, instrumentalities or evidence of the crime committed. *Gates,* 462 U.S. at 236, 238–39, 103 S.Ct. at 2331, 2332–33; *Steagald,* 451 U.S. at 213, 101 S.Ct. at 1648; *Zurcher v. Stanford Daily,* 436 U.S. at 558, 98 S.Ct. at 1977; *Brinegar,* 338 U.S. at 175, 69 S.Ct. at 1310; *Dumbra,* 268 U.S.

cause from affidavits that are objectively unreasonable.

For instance, in *United States v. Angulo–Lopez,* 791 F.2d 1394 (9th Cir.1986), the Ninth Circuit stated:

> The issue of a "good faith" execution of a warrant that is unsupported by probable cause should not be addressed by the district court until the district judge has determined that probable cause is lacking. If the court determines that the affidavit is sufficient to support a warrant, good faith reliance is irrelevant. Our court would be in a position to review the *Leon* issue only where the affidavit was deficient and the district court has made findings on the good faith issue.

*Id.* at 1399 n. 3. This approach has resulted in a developed body of precedent distinguishing an affidavit lacking a substantial basis from one so lacking indicia of probable cause as to preclude official reliance. In contrast, the Fifth Circuit and the Eighth Circuit, with limited exceptions, address the good faith exception first. *See, e.g., United States v. Satterwhite,* 980 F.2d 317 (5th Cir.1992); *United States v. Craig,* 861 F.2d 818, 820 (5th Cir.1988); *United States v. Livesay,* 983 F.2d 135 (8th Cir.1993). The resulting precedent does not provide similar guidance on the specific issue under discussion; a finding of good faith reliance can be based upon an affidavit that in fact contained probable cause, as well as one that failed yet contained sufficient indicia of probable cause.

at 441, 45 S.Ct. at 548–49; *see also United States v. Ramos,* 923 F.2d 1346, 1351 (9th Cir.1991).

81. It was clearly established that " '[s]ufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be mere ratification of the bare conclusions of others.' " *Leon,* 468 U.S. at 915, 104 S.Ct. at 3416 (quoting *Gates,* 462 U.S. at 239, 103 S.Ct. at 2332).

82. The Court will impute knowledge of the foregoing clearly established rules to the reasonably well-trained officer in this case.

83. The Court now examines the type of facts it should consider in determining whether the Government has established the applicability of the *Leon* exception to the federal exclusionary rule.

84. Generally, probable cause is reviewed within the four corners of the affidavit. *See Leon,* 468 U.S. at 913–14, 104 S.Ct. at 3415–16; *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978) (strictly limiting the circumstances in which a defendant may offer evidence showing the falsity of statements in the affidavit of probable cause).

85. The *Leon* Court, in assessing the objective reasonableness of relying upon the *probable cause* that had been accepted by a magistrate, did not venture beyond the four corners of the affidavit, except to note that the lower courts had been unable to agree on the existence of probable cause in the affidavit in question. *Leon,* 468 U.S. at 926, 104 S.Ct. at 3422. Nonetheless, in assessing the objective reasonableness of relying upon the *technical sufficiency* of a warrant, the Court examined facts limited to events transpiring during the warrant process. *Massachusetts v. Sheppard,* 468 U.S. 981, 989, 104 S.Ct. 3424, 3428, 82 L.Ed.2d 737 (1984).[7] The Supreme Court focused its inquiry in this regard on whether "the officers ... took every step that could reasonably be expected of them." *Id.*

86. In bolstering determinations of objective reasonableness with findings that the officials had done all that could be reasonably expected of them, courts have looked to various factors. These factors include whether the warrant and affidavit were submitted to an attorney for review and approval, *id.; Johns,* 948 F.2d at 605; *Freitas II,* 856 F.2d at 1431–32; *United States v. Michaelian,* 803 F.2d 1042, 1046–47 (9th Cir.1986); *United States v. Fama,* 758 F.2d 834, 837–38 (2d Cir.1985); whether the magistrate reassured the applying officer that suspect provisions of the warrant or affidavit were appropriate, *Sheppard,* 468 U.S. at 989, 104 S.Ct. at 3428; *Freitas II,* 856 F.2d at 1431–32; *United States v. Kepner,* 843 F.2d 755, 763–64 & n. 7 (3d Cir.1988); *United States v. Spilotro,* 800 F.2d 959, 968 (9th Cir.1986); *Fama,* 758 F.2d at 835, 837; whether the magistrate altered the warrant or affidavit in an attempt to conform it to law, *Sheppard,* 468 U.S. at 989, 104 S.Ct. at 3428; *Corral–Corral,* 899 F.2d at 938–39; whether the affiant produced to the magistrate additional facts in repeated attempts to establish probable cause, *United States v. Edwards,* 798 F.2d 686, 690–92 (4th Cir.1986); whether the affidavit detailed an extensive investigation, *Leon,* 468 U.S. at 926, 104 S.Ct. at 3422; *Michaelian,* 803 F.2d at 1047; and whether external time constraints limited the officer's ability to do more to comply with the warrant requirement. *Ramos,*

---

7. At least one court has supported objective reasonableness of relying on a magistrate's determination of probable cause with facts known to the official but never communicated to the magistrate. *United States v. Dickerson,* 975 F.2d 1245, 1249–50 (7th Cir.1992), *petition for cert. filed,* (Dec. 12, 1992). Due to the emphasis given the *magistrates* role in *Gates, Leon,* and *Sheppard* and the Supreme Court's reservations about warrantless searches, *see United States v. Santtini,* 963 F.2d 585, 595–96 (3d Cir.1992), this Court concludes that it may be appropriate to include facts beyond the affidavit of probable cause, but only to the extent that they relate to communications between the affiant and the issuing magistrate or the warrant process. *See United States v. Hove,* 848 F.2d 137, 140 (9th Cir.1988); *accord United States v. Ramos,* 923 F.2d 1346, 1352–53 n. 14 (9th Cir.1991); *United States v. Edwards,* 798 F.2d 686, 691–92 (4th Cir.1986).

923 F.2d at 1355 n. 18; *Weber,* 923 F.2d at 1346; *Edwards,* 798 F.2d at 690.

87. Finally, in assessing whether the quantum of factual support in an affidavit of probable cause could have led an officer to objective reasonable reliance, the Supreme Court has indicated that "evidence sufficient to create disagreement among thoughtful and competent judges as to the existence of probable cause ..." indicates *ex post facto* that enough indicia of probable cause was contained in the affidavit to make the officer's reliance objectively reasonable. *Leon,* 468 U.S. at 926, 104 S.Ct. at 3422.

## B. *Conclusions of Law*

88. The Government's argument regarding indicia of probable cause is limited to reliance upon the District Justice's issuance of the warrant and the statement by the Suppression Court that the warrant was supported by probable cause. Government's Brief in Opposition to Defendant's Motion to Suppress (Conley Motor Freight, 9/88) at 29.

89. The Suppression Court made this statement as part of an extensive multi-issue opinion in a single conclusory paragraph that found probable cause for numerous other warrants as well. *See supra,* note 3. This Court does not have the benefit of the Suppression Court's reasoning about the affidavit and warrant in question. Also, as the evidence was suppressed on other grounds, it is clear that the Suppression Court's statement was not necessary to the decision rendered. *Compare supra,* note 2 *and* note 3. A clear peril of dicta is that such statements may not have been examined as closely as a statement upon which the outcome of a matter turns.

▮ 90. Moreover, this Court is the first federal court to address whether evi-

dence from the search in question must be suppressed because the search by state officers violated the defendants' federal constitutional rights. In such matters, this court "must make an independent inquiry, whether or not there has been such an inquiry by a state court, and irrespective of how any such inquiry may have turned out. The test is one of federal law, neither enlarged by what one state court may have countenanced, nor diminished by what another may have colorably suppressed." *Elkins v. United States,* 364 U.S. 206, 224, 80 S.Ct. 1437, 1447, 4 L.Ed.2d 1669 (1960); *see also id.* at 248, 80 S.Ct. at 1461 (Frankfurter, J. dissenting).

▮ 91. This Court concludes that the affidavit is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.

92. A great part of the affidavit is directed at establishing that 930 Saw Mill Run Boulevard was the business address of Duffy Vending Company. Indeed, the only inference offered by the affiant was, "Based on the above information, affiant concludes that the business address of Duffy's Vending Co., is 930 Sawmill Run Blvd., Pittsburgh, Pa. 15220...." The Court fully accepts this conclusion.

93. The affidavit may well make a sufficient showing of the "crime" element of probable cause.[8] Nonetheless, it is critically deficient—a bare bones affidavit—regarding the connection between the gambling activities described in the affidavit and the premises to be searched. *Compare Ramos,* 923 F.2d at 1353-55; *Malin,* 908 F.2d at 165-67; *Hove,* 848 F.2d at 138-39; and *United States v. Holzman,* 871 F.2d 1496, 1511 (9th Cir.1989).

94. The affidavit did not set forth any facts indicating the proprietors of the pay-off locations were storing materials at the

---

**8.** Notwithstanding the clearly established law set forth in paragraphs 58 & 80, the Government would have this Court rule that "[p]robable exists if 'the facts and circumstances known to the officer warrant a prudent man in the officer's shoes in believing that an offense has been committed.' *United States v. Massac,* 867 F.2d 174, 175 (3d Cir.1989)." Government's Proposed Findings of Fact and Conclusions of Law,

at 6. Even the case cited by the Government demonstrates that more is required. *Massac,* 867 F.2d at 176 ("Having determined that the police officer possessed probable cause to make *an* arrest at the railroad station based on a reasonable belief as to contemporaneous illegal narcotics activity, we must next determine whether he had probable cause to arrest *the defendant.*") (emphasis added).

premises. It did not indicate that Duffy Conley or Duffy Vending Co. or its employees had engaged in gambling conduct, through gambling devices *per se* or knowingly furnishing machines intended to be used for gambling purposes. Duffy Vending's ownership of the machines coupled with Duffy Conley's remote conviction for unspecified conduct in relation to an unconnected establishment are averments "so tenuous that no reasonable police officer could have believed that portion of the warrant was supported by probable cause." *Holzman*, 871 F.2d at 1511–12 n. 4.

95. Any inference from the averments of the affidavit that Duffy Conley, Duffy Vending co. or its employees were part of a wide ranging "gambling operation," or otherwise connected to the gambling activities related in the affidavit, is speculative and not reasonably supported in the averments of the affidavit.[9] In short, the affidavit made a woefully inadequate showing in its attempt to connect evidence of the gambling activities at the pay-off locations to the premises of 930 Saw Mill Run Boulevard.

96. Nowhere in the affidavit is the conclusion drawn that probable cause exists. The affidavit's request "that this search warrant be issued in an effort gain a better insight into the internal works of this gambling operation," while having no bearing on probable cause, does indicate to this Court that the affiant was aware of the paucity of the showing linking the premises to any gambling operation.

97. Moreover, the affiant did not take all steps that were reasonably possible under the circumstances. The affiant did not have an attorney review or approve the application presented to the District Justice. He did not rely upon reassurances from the District Justice that the affidavit as presented was sufficient, and no changes were made to it. While the affidavit indicates an extensive, if not intensive, investigation occurred, the affiant did not relate the critical, lacking details to the District Justice in the process of seeking this warrant. Having been involved in both investigations referenced in the affidavit, he presumably knew the missing details. Finally, the evidence sought in the search warrant was not going to be imminently transported, distributed or consumed. There were no externally imposed time-constraints on the proposed search.

98. The *Leon* good faith exception to the exclusionary rule is inapplicable.

An appropriate order will be entered granting the motion to suppress as to defendants with standing to challenge the search.[10]

### ORDER OF COURT

And now this 3rd day of February, 1993, having considered the matters set forth in the Court's Memorandum Opinion of even date, it is hereby ORDERED, ADJUDGED AND DECREED that:

1. Defendant Curtin's Pretrial Motions: Motion to Suppress (Document No. 393) is DENIED IN PART as follows:

> The Motion to Suppress items seized during the September 23, 1988 search of 930 Saw Mill Run Boulevard is DENIED as to Defendant Curtin.

2. The Court having found that Defendant Curtin has no standing, Defendant, William C. Curtin's Motion to Join Pretrial

---

9. On the issue of whether the affidavit's failure to include a substantial basis for concluding that probable cause exists is such that the affidavit lacked indicia of probable cause sufficient to allow objectively reasonable reliance, the Court received the expert testimony of Stephen F. Tercsak, a former supervisor of detectives for the City of Pittsburgh Police. N.T. July 13, 1992 at 15–74 (Document No. 463). This expert testimony, which the Court finds to be credible, leads the Court to find as fact hereby that a reasonably well-trained police officer in the City of Pittsburgh would have known that the affida-vit did not set forth facts constituting probable cause. The Court, however, notes that, to the extent this issue is not amenable to factual findings, its independently derived legal conclusion, without regard to the expert testimony, is unaffected.

10. The Court's resolution of the probable cause and good faith issues is dispositive of the motion to suppress; it does not, therefore, address the various other grounds for suppression raised by the defendants.

Motions of Co–Defendants (Document No. 423, ¶ 6(a)) is DENIED IN PART as follows:

The Motion to Join, as it relates to motions seeking suppression of the items seized during the September 23, 1988 search of 930 Saw Mill Run Boulevard, is DENIED.

3. The Court having found that Defendant Curtin has no standing, having considered in his favor the briefs-to-be-adopted, Defendant Curtin's Motion to Adopt Briefs and/or Memoranda of Law of Defendants John F. "Duffy" Conley, Sheila Smith and John Francis "Jack" Conley, Regarding 1988 Search of 930 Saw Mill Run Boulevard (Document No. 491) is DENIED.

4. Defendant Sheila Smith's Motion to Join (Document No. 434) is GRANTED IN PART AND DENIED IN PART AS MOOT as follows:

The Motion to Join is DENIED AS MOOT to the extent that it seeks to join that part of Defendant Curtin's Pretrial Motions: Motion to Suppress (Document No. 393) that is denied in paragraph one of this order;

The Motion to Join is GRANTED to the extent that it seeks to join that part of the Pretrial Motions of John F. "Duffy" Conley: Motion to Suppress Physical Evidence (Document No. 377) that moves to suppress items seized during the September 23, 1988 search of 930 Saw Mill Run Boulevard.

5. The Motion of Defendant John Francis "Jack" Conley to Join in and Adopt the Pre–Trial Motions of Co–Defendants (Document No. 418, ¶ 3) is GRANTED IN PART as follows:

The Motion, as it relates to motions seeking suppression of the items seized during the September 23, 1988 search of 930 Saw Mill Run Boulevard, is GRANTED.

6. The Motion of Defendant John Francis "Jack" Conley to Join in and Adopt the Memorandums of Law Re: 1988 Search of 930 Saw Mill Run Boulevard Filed on Behalf of Co–Defendants John F. "Duffy" Conley and Sheila F. Smith (Document No. 480) is GRANTED.

7. The Motion of Defendant John Francis "Jack" Conley to Join in and Adopt the Proposed Findings of Fact and Conclusions of Law of Defendants John F. "Duffy" Conley and Sheila F. Smith (Document No. 518) is GRANTED.

8. Defendant John Conley, Jr.'s Motion to Adopt Briefs of Defendants John Conley and Sheila Kelley Smith Regrading 1988 Search of 1988 [sic] Saw Mill Run Boulevard (Document No. 484) is GRANTED.

9. Defendant Jack Conley's Omnibus Pretrial Motion: XI. Motion to Suppress Physical Evidence (Document No. 374), Pretrial Motions of John F. "Duffy" Conley: Motion to Suppress Physical Evidence (Document No. 377), and Defendant Sheila Smith's First Supplemental Motion to Suppress Physical Evidence (930 Saw Mill Run Boulevard) (Document No. 448) are GRANTED IN PART as follows:

All items seized during the September 23, 1988 search of 930 Saw Mill Run Boulevard, as identified in the inventories, are SUPPRESSED;

Ruling on suppression of evidence derivative of the items seized during the September 23, 1988 search of 930 Saw Mill Run Boulevard is DEFERRED pending evidentiary hearings on the matter.

IT IS FURTHER ORDERED that all motions and parts of motions not expressly ruled upon hereby remain pending.